765 So.2d 1171 (2000)
In the Matter of BASF CORPORATION'S EXEMPTION PERMIT FROM HAZARDOUS WASTE LAND DISPOSAL RESTRICTIONS (No. LAD 040 776 809).
No. 99 CA 0302.
Court of Appeal of Louisiana, First Circuit.
July 31, 2000.
Rehearing Denied September 14, 2000.
*1173 Elizabeth Teel, Tulane Environmental Law Clinic, New Orleans, for Plaintiffs-Appellants Louisiana Environmental Action Network, et al.
William R. D'Armond, Maureen N. Harbourt, Esteban Herrera, Jr., Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., Baton Rouge, for Defendant-Appellee BASF Corporation.
Christopher A. Ratcliff, Baton Rouge, for Defendant-Appellee Louisiana Department of Environmental Quality.
Before: SHORTESS, C.J., PARRO, and KUHN, JJ.
PARRO, J.
This is an appeal by citizen groups from a decision of the Louisiana Department of Environmental Quality (DEQ), in a permit action, to grant an exemption to BASF Corporation (BASF) from the statutory ban on the land disposal of hazardous waste.

FACTUAL AND PROCEDURAL HISTORY
BASF filed an application with DEQ seeking approval to continue operating an injection well for the disposal of waste hydrochloric acid (HCI) at its facility in Geismer, Louisiana.[1] On May 30, 1995, DEQ issued its decision to approve the application for an exemption. The Louisiana Environmental Action Network (LEAN) and the Ascension Parish Residents Against Toxic Pollution (APRATP) appealed that decision to this court. That appeal was transferred to the Nineteenth Judicial District Court subsequent to a legislative change in appellate jurisdiction over DEQ decisions. Thereafter, the district court remanded the matter to the DEQ Secretary to make basic findings supported by the evidence and ultimate findings which flow rationally from the basic findings, and for the articulation of a rational connection between the facts found and the decision granting the exemption to BASF, as required by Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984).[2]
On December 22, 1997, DEQ issued its findings, in compliance with the order of the district court, maintaining its previously issued decision granting an exemption in favor of BASF. Again, LEAN and APRATP filed a petition for judicial review in the district court. On September 15, 1998, the district court signed a judgment which affirmed the decision of DEQ and dismissed appellants' petition for review. From this judgment, LEAN and APRATP appeal.
On appeal, appellants urge this court to find that the district court erred in affirming the decision of DEQ, in short, because they allege alternative disposal methods were available and because they maintain DEQ should have required more extensive monitoring of the injection well.[3]

*1174 DISCUSSION

APPLICABLE LAW
This matter is governed by LSA-R.S. 30:2193, which currently provides:
A. It is the determination of the legislature that Louisiana is particularly ill-suited both hydrologically and climatically to hazardous waste land disposal methods and past land disposal methods, siting criteria, and maintenance procedures have, despite the degree of stringency, been inadequate to insure the health of the citizens of the state and in maintaining the integrity of the environment generally and water resources specifically. It is further determined that eventual releases of hazardous constituents from land disposal facilities are highly probable if land disposal methods continue to be relied upon and that there presently exists alternatives which may be used to destroy, reduce, or lessen the toxicity of or lessen the leaching potential of hazardous wastes. In order to preclude further environmental damage and endangerment to the citizens of the state, it is the purpose of this Section to provide for restrictions and incentives designed to encourage alternative methods of hazardous waste disposal, destruction, and reduction; to lessen the possibility of hazardous waste releases from existing land disposal sites; and to provide for the eventual prohibition of land disposal of hazardous waste.
B. As used in this Section, the following terms shall have the meaning ascribed to them in this Subsection, unless the context clearly indicates otherwise:
(1) "Containment system" means a system designed to contain hazardous waste or materials within the confines of a hazardous waste disposal, storage, or treatment facility and operating within and according to the limits and conditions of its permit.
(2) "Encapsulation" means the pressing or bonding together and completely enclosing within a coating or jacket of inert material so as to prevent leaching potential from a department approved hazardous waste containment system.
(3) "Land disposal" means placement in or on the land and includes, but is not limited to, placement in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt-dome formation, salt-bed formation, underground mine or cave, or placement in a concrete vault or bunker intended for disposal purposes.
(4) "Stabilization or Solidification" means the modification of wastes in a manner which ensures that the hazardous *1175 constituents are maintained in their least soluble form.
C. The secretary shall promulgate rules and regulations which:
(1) Identify generic categories of hazardous wastes that are inappropriate for land disposal and selected recycling, treatment, and destruction technologies applicable to waste streams in each category.
(2) Identify the waste constituents that present the greatest risks when disposed of in the land.
(3) Set target dates for the prohibition of land disposal of those wastes identified in Paragraph (2) based on:
(a) The risks involved.
(b) The availability of alternative facilities and methods within the state.
(4) Use the following general characteristics to determine which wastes pose the greatest risk to public health and environment when disposed of in the land:
(a) Toxicity.
(b) Persistence in the environment.
(c) Ability to bioaccumulate.
(d) Mobility in a land disposal environment.
(5) Provide for emergency variances.
(6) Provide for an exception from the application of this Section for special wastes which include:
(a) Spent bauxite (red mud) resulting from production of alumina.
(b) Byproduct gypsum and related wastes resulting from the production of phosphoric acid, phosphate fertilizers, and hydrofluoric acid.
(c) Coal residue (bottom ash and slag, fly ash, and flue-gas emission control waste) after use as a boiler fuel.
(d) Cement kiln dust.
(e) Industrial waste water in a NPDES treatment train when that train includes ponds, impoundments, or similar facilities.
(7) Prohibit the storage of hazardous waste that has been banned from land disposal unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment, or disposal by appropriate means.
D. (1) Not later than January 1, 1986, the secretary shall determine what economically and technically feasible and environmentally sound alternatives are available in the state for processing, treating, destroying, recycling, reducing, or neutralizing the hazardous waste as identified in Subsection C.
(2) Between January 1, 1986, and June 1, 1992, any hazardous waste for which there is no alternative disposal, destruction, reduction, or recycling method in the state shall be land disposed only after stabilization, solidification, containment, encapsulation, or approved land treatment techniques in a manner and with a material sufficient to prevent the leaching potential of such wastes except that the secretary may, upon a showing that no other reasonable alternative exists, permit the injection of hazardous waste in an injection well. The burden of proof shall rest with the generators of such hazardous waste that they cannot meet the requirements of this Subsection, and the secretary shall determine the sufficiency and adequacy of such proof and evidence presented by generators.
E. (1) Effective June 1, 1992, and thereafter, the land disposal of hazardous waste shall be prohibited, except as provided in this Subsection and by regulations promulgated by the secretary pursuant to Subsection C of this Section.
(2) Any person seeking an exemption from the prohibition on the land disposal of hazardous waste shall file a written request for such exemption with the secretary. The secretary, after considering reasonable economic and environmental alternatives, may allow the land disposal of certain hazardous waste if in his determination:
(a) The best available technology cannot further reduce the toxicity, corrosiveness, *1176 virulent or infectious character, or volume of the hazardous waste.
(b) The waste cannot be further reduced through production modifications.
(c) The waste or specific constituents of the waste cannot be reclaimed and reused.
(d) The waste can be permanently confined within a department-approved hazardous waste containment system.
(e) The land disposal of the hazardous waste does not and will not endanger public health or the environment.
(f) No reasonable alternative exists to the injection of hazardous waste in an injection well.
(3) The burden of proof that the conditions of Paragraph (2) of this Subsection have been met shall rest with the person requesting the exemption.
(4) Hazardous waste or residues thereof which have been treated to the level of or by a method specified in regulations promulgated under Subsection C of this Section shall not be subject to any prohibition promulgated under this Subsection, and may be disposed of in a land disposal facility which meets the requirement of this Subtitle.
(5) Hazardous waste or residues thereof which have been granted a case-by-case extension, emergency variance, or variance pursuant to the regulations promulgated under Subsection C are not prohibited and may be disposed of in a land disposal facility which meets the requirements of this Subtitle.
(6) Newly listed hazardous waste or residues thereof which have no treatment standard are not prohibited and may be disposed of in a land disposal facility which meets the requirements of this Subtitle until standards are established pursuant to the regulations promulgated under Subsection C.
F. Any person found by the secretary to be in violation of any requirement or provision of this Section may be liable for a civil penalty of one hundred thousand dollars for each separate violation.
G. This Section shall not apply to the land disposal of hazardous waste by injection well provided that:
(1) Such land disposal has been exempted by the United States Environmental Protection Agency from land disposal prohibitions contained in the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.
(2) A permit has been issued for such injection well by the Louisiana office of conservation pursuant to Chapter 1 of Subtitle I of this Title and of the Safe Drinking Water Act, 42 U.S.C. 300(f) et seq.
(3) The secretary determines that there are no economically reasonable and environmentally sound alternatives to the injection of such hazardous waste.

APPLICATION OF STATUTORY AMENDMENT
After BASF originally filed its application with DEQ in May 1990, LSA-R.S. 30:2193 was amended several times. Paragraphs (E)(4), (5), and (6) were added by 1990 La. Acts, No. 649, § 1. Paragraphs (D) and (E) were amended by 1990 La. Acts, No. 979, § 1, to change the effective date of the land ban from January 1, 1991, to June 1, 1992, as well as to change other minor wording in paragraph (E). Paragraph (G) was added by 1997 La. Acts, No. 548, § 1. Since LSA-R.S. 30:2193(G) ostensibly reduces BASF's burden of proof for obtaining the permit sought from DEQ, we must consider whether 1997 La. Acts, No. 548, § 1, is applicable to this action.
The general rule of law is that, in the absence of contrary legislative expression, substantive laws apply prospectively only, while procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary. LSA-C.C. art. 6. Article 6 requires that we engage in a twofold inquiry: first, we must ascertain *1177 whether in the enactment of the law the legislature expressed its intent regarding retrospective or prospective application; if not, we must then classify the enactment as substantive, procedural, or interpretive. Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.5/9/97), 694 So.2d 180, 183; Rousselle v. Plaquemines Parish School Board, 93-1916 (La.2/28/94), 633 So.2d 1235, 1244; Cole v. Celotex Corporation, 599 So.2d 1058, 1063 (La.1992); Adams v. City of Baton Rouge, 95-2515 (La.App. 1st Cir.4/30/96), 673 So.2d 624, 632, writs denied, 96-1491, 96-1492 (La.9/20/96), 679 So.2d 439.
Section 2 of 1997 La. Acts, No. 548, reads:
This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.
This language established the effective date of the amendment as the date of signature by the governor, which was July 3, 1997. However, neither this language, nor any other language in the act is dispositive regarding retrospective or prospective application to actions in which a DEQ decision has been issued, but the matter is still pending before the DEQ on remand by a court; therefore, we must classify the enactment as substantive, procedural, or interpretive. See Gauthreaux v. Trosclair, 95-0549 (La.App. 1st Cir.6/28/96), 676 So.2d 213, 217.
It is well-settled that substantive laws either establish new rules, rights, and duties, or change existing ones, while interpretive laws merely establish the meaning the statute had from the time of its enactment. Keith v. United States Fidelity & Guaranty Company, 694 So.2d at 183; St. Paul Fire & Marine Insurance Company v. Smith, 609 So.2d 809, 817 (La.1992). Procedural laws prescribe a method for enforcing a previously existing substantive right and relate to the form of the proceeding or the operation of the laws. Keith v. United States Fidelity & Guaranty Company, 694 So.2d at 183; Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714, 723, cert. denied sub nom., Allstate Insurance Company v. Louisiana Insurance Guaranty Association, 511 U.S. 1142, 114 S.Ct. 2165, 128 L.Ed.2d 887 (1994).
In Adams v. City of Baton Rouge, 673 So.2d at 634, at issue was a statute, enacted after the plaintiff filed his lawsuit, giving plaintiff a right to a jury trial; the court reasoned that the grant by the legislature of a right to trial by jury to an individual who previously had no such right did not divest or otherwise affect any substantive right of another party. The Adams court concluded that because the statute addressed the mode or means of the trial, it was procedural in nature and did not affect any vested rights and could be applied retroactively. Adams v. City of Baton Rouge, 673 So.2d at 635.
In Keith v. United States Fidelity & Guaranty Company, 694 So.2d at 182, the act at issue amended LSA-C.C. art. 2323 to require the quantification of fault in a personal injury action of all persons causing or contributing to the injury, death, or loss regardless of whether the person was a party to the action or a non-party, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of LSA-R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. Amended LSA-C.C. art. 2323 was held to require the quantification of fault of an employer in a personal injury action, contrary to the last pronouncement of the Louisiana Supreme Court in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95), 657 So.2d 975. The legislature did not express whether it intended the amendment of LSA-C.C. art. 2323 to have retrospective or prospective application. *1178 In finding the act procedural in nature, the Keith court reasoned that since the substantive right to allocate fault was created in 1979 with the introduction of comparative fault, the amendment of LSC.C. art. 2323 was simply a delineation of a method for enforcing that substantive right as it applied, in particular, to a statutory employer. Keith v. United States Fidelity & Guaranty Company, 694 So.2d at 183.
In considering 1997 La. Acts, No. 548, § 1, we find a situation similar to that reviewed in Keith v. United States Fidelity & Guaranty Company; i.e., the substantive right of BASF to apply for an exemption from the land disposal of hazardous waste existed in LSA-R.S. 30:2193(E)(2) prior to the enactment of 1997 La. Acts, No. 548, § 1. Act 548 simply lessens the burden on the party seeking to operate an injection well for the land disposal of hazardous waste by requiring only a determination from the DEQ Secretary "that there are no economically reasonable and environmentally sound alternatives to the injection of such hazardous waste," where: (1) such land disposal has been exempted by the United States Environmental Protection Agency from land disposal prohibitions contained in the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., and (2) a permit has been issued for such injection well by the Louisiana Office of Conservation pursuant to Chapter 1 of Subtitle I of Title 30 and of the Safe Drinking Water Act, 42 U.S .C. 300(f) et seq. Thus, we find Act 548 to be procedural and applicable to the instant proceeding.

REVIEW OF AGENCY DECISION
On review, an appellate court should not reverse a substantive decision of DEQ on its merits unless it can be shown that the Secretary was arbitrary or clearly gave insufficient weight to environmental protection in balancing the costs and benefits of the proposed action. In the Matter of American Waste and Pollution Control Company, 93-3163 (La.9/15/94), 642 So.2d 1258, 1265; Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d at 1159.
In making a decision, DEQ is required to make basic findings supported by the evidence and ultimate findings which flow rationally from the basic findings; it must also articulate a rational connection between the facts found and the order issued. In the Matter of American Waste and Pollution Control Company, 642 So.2d at 1266; Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d at 1159. A decision in conformity with these mandates should contain: (1) a general recitation of the facts as presented by all sides; (2) a basic finding of facts as supported by the record; (3) a response to all reasonable public comments; (4) a conclusion or conclusions on all issues raised which rationally support the order issued; and (5) any and all other matters which rationally support the DEQ's decision. In the Matter of Rubicon, Inc., 95-0108 (La.App. 1st Cir.2/14/96), 670 So.2d 475, 483. Additionally, the written findings of fact and reasons for decision must satisfy the issues of whether: (1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; (2) a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrate that the latter outweighs the former; and (3) there are no alternative projects or alternative sites or mitigating measures which would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable. In the Matter of Rubicon, Inc., 670 So.2d at 483; Blackett v. Louisiana Department of Environmental Quality, 506 So.2d 749, 754 (La.App. 1st Cir.1987).
In approving the hazardous waste injection well at issue in this case, DEQ's amended permit letter subjected the approval to numerous conditions, which included: *1179 a restricted injection interval of 5020 feet to 5456 feet below the surface of the land; annual bottom hole pressure surveys; monitoring of the lowermost underground source of drinking water; reporting of annual waste minimization/reduction activities; yearly reports detailing marketing efforts; alternative disposition of waste prior to injection;[4] restricted injection maximum of 12,000,000 gallons per calendar year; notification to DEQ within twenty-four hours of injection of waste; construction of a containment system around the wellhead; review of exemption upon loss of the Department of Natural Resources' Underground Injection Control permit; cessation of injection on January 1, 2008; and, mandated termination of the exemption on violation of any condition.[5] Reasons for and findings in support of DEQ's decision granting the exemption were given in a twenty-one page attachment to its approval letter. Responses to public comments were given by DEQ in a nine page attachment to the approval letter.
The reasons of the DEQ Secretary essentially state that 1997 La. Acts, No. 548, adding LSA-R.S. 30:2193(G), governs BASF's application. The DEQ Secretary contends that because BASF meets the provisions of LSA-R.S. 30:2193(G), no exemption is required as paragraph (E)(2) of section 2193 is rendered inapplicable. The DEQ Secretary notes that BASF has received the requisite U.S. Environmental Protection Agency exemption and the Louisiana Office of Conservation permit. Further, the DEQ Secretary concludes that BASF has satisfactorily shown that there are "no economically reasonable and environmentally sound alternatives" to the injection of waste HCI. Nevertheless, the DEQ Secretary goes on to discuss BASF's compliance with the provisions of LAC 33:V.2271, stating the information was compiled prior to the enactment of Act 548.[6] Furthermore, the DEQ Secretary, in his letter of approval states, "This exemption is granted ...."[7]
In upholding the decision of the DEQ, the district court judge found as follows:
Question One is whether or not there is an economically reasonable and [environmentally] sound alternative to disposal by injection as required by R.S. 30:2193.
On Page 6, 7, and 8, the secretary has gone into the different possibilities. The court is impressed with the amount of salt water that would have to be injected into the Mississippi River, and the court understands that this has already been approved, that as between 160 tons of salt into the river or putting this acid a mile underground, it appears to me that the secretary has not abused its discretion in making the decision that it would be better to put it a mile underground.

*1180 Many of the ancient civilizations that failed in their irrigation efforts failed because of the buildup of salt. Babylonians, Samaritans, even some of the Western Indian tribes that used irrigation, their systems failed after a while because of the buildup of salt. It ruins agriculture. New Orleans ends up getting the waste that doesn't go into Ascension.
The court is impressed with the fact that the injected waste is neutralized within 816 feet of the bore hole. The cost[s] of other methods of disposal are far greater than should be required considering the risks, the minor risks.
The [second] question is can BASF be legally exempted from the monitoring requirements imposed by the regulations, and the question here is whether there is an undue risk, whether it is necessary, and in this particular case, because of the limited 816 feet of migration, the distance it is underground, the probability or improbability of it migrating into an aquifer, and the presence of wells to determine whether or not this has migrated anywhere close to an aquifer, that the cost as to the monitoring well and the minor risks involved, the court finds that the secretary of DEQ has not abused its discretion.
An appeal to this court from the judgment or ruling of the district court is authorized by LSA-R.S. 30:2050.31.[8] Judicial review is governed by LSA-R.S. 49:964(C), (F), and (G) in accordance with LSA-R.S. 30:2050.21(F). LSA-R.S. 49:964(G) provides that the court may affirm the decision of the agency or remand the case for further proceedings; or, the court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
Appellants argue that LSA-R.S. 30:2193(G) is inapplicable in this case because BASF has alternative means of disposing of its waste HCI. Appellants point to the fact that BASF has not needed to use its injection well since 1991, since it has either used or sold its excess HCI. However, the DEQ Secretary cites the increasing ratio of supply to demand in the HCI commercial market in support of his finding of a lack of alternative disposal methods, concluding that since supply of HCI exceeds demand, BASF may not be able to continue to sell all of its excess HCI in the near future. The DEQ Secretary also discounted neutralization as a feasible HCI disposal alternative, citing a scientific study showing that the neutralization process would result in a tenfold increase in volume, as compared to unneutralized acid that would be disposed of in the injection well, or some 1.5 million gallons of salt water to be discharged into the Mississippi River on a daily basis. Additionally, *1181 the acid neutralization process produces waste sludges that require disposal in landfills. Other chemical recycling processes proposed were rejected as being economically unfeasible, which would require BASF to invest in multimillion dollar manufacturing facilities. Our review of the record reveals that the DEQ Secretary correctly concluded that no economically reasonable and environmentally sound alternatives to disposal by deep well injection exist. Accordingly, we find that LSA-R.S. 30:2193(G) is applicable to this case.
Appellants also argue on appeal that DEQ erred in failing to require additional monitoring of the injection well. Although DEQ ordered BASF to use their deep monitoring well, MW-1, to satisfy the ambient requirements for the lowermost underground source of drinking water, appellants maintain DEQ erred in failing to require additional monitoring of the first aquifer overlying the confining area, monitoring of groundwater quality in the first aquifer overlying the confining area, and the use of indirect, geophysical techniques to determine the position of the waste front, the water quality in a formation designated by the administrative authority, or to provide other site-specific data, all in accordance with LAC 33:V.2271(N). Since we have concluded in this opinion that LSA-R.S. 30:2193(G) provides that the requirements of LSA-R.S. 30:2193(E)(2) and LAC 33:V.2271 are not applicable to a paragraph (G) applicant, appellants' reliance on LAC 33:V.2271(N) is misplaced.[9] Therefore, we find it unnecessary to rule on whether the DEQ Secretary erred in the level of monitoring ordered in this case.
After reviewing the extensive record compiled before DEQ, we find no error in the DEQ decision authorizing the BASF injection well and finding LSA-R.S. 30:2193(E) inapplicable to BASF in this matter. For the reasons assigned, we affirm the judgment of the district court; all costs of this appeal are to be borne by appellants, Louisiana Environmental Action Network and Ascension Parish Residents Against Toxic Pollution.
AFFIRMED.
KUHN, J., concurs.
NOTES
[1] Effective June 1, 1992, and thereafter, LSA-R.S. 30:2193(E)(1) banned the land disposal of hazardous waste, but a procedure for obtaining an exemption to that ban is provided in LSA-R.S. 30:2193(E)(2). While the parties to this appeal generally refer to the permission BASF received from DEQ to dispose of hazardous waste in its injection well as an "exemption," the DEQ proceeding to obtain the exemption is also referred to as a "permit action." See LSA-R.S. 30:2178-80; 30:2183. See also LAC 33:V.109.
[2] See also Matter of Rubicon, Inc., 95-0108 (La.App. 1st Cir.2/14/96), 670 So.2d 475, 482-83.
[3] Appellants assert the following assignments of error on appeal:

1. The Nineteenth Judicial District Court committed reversible error when it affirmed DEQ's decision to grant BASF an exemption from the statutory ban on land disposal of hazardous waste because the statute expressly prohibits such an exemption when DEQ finds that there are economically reasonable and environmentally sound alternatives to underground injection and at least three such alternatives exist.
2. The Nineteenth Judicial District Court committed reversible error when it affirmed DEQ's decision to grant BASF an exemption from the statutory ban on land disposal of hazardous waste because DEQ violated its constitutional duties as the primary public trustee of the environment by failing to require the use of alternative projects that would offer more protection to the environment than injection without unduly curtailing non-environmental benefits.
3. The Nineteenth Judicial District Court committed reversible error when it affirmed DEQ's decision to grant BASF an exemption from the regulatory requirement of comprehensive monitoring utilized to detect hazardous waste because DEQ ignored the plain language of the regulations, failed to adequately explain its decision and relied upon clearly inadequate evidence to justify the exemption.
4. The Nineteenth Judicial District Court committed reversible error when it affirmed DEQ's decision to grant BASF an exemption from the regulatory requirements of monitoring because DEQ violated its constitutional duties as the primary public trustee of the environment by failing to avoid potential adverse environmental effects to the maximum extent possible, and by failing to properly consider mitigating measures and potential costs to the environment of not requiring monitoring wells.
[4] Before the injection of any waste acid, BASF is required to: (a) use, reuse, reclaim, or recycle excess acid on-site, to the maximum extent possible; (b) aggressively market the sale of any excess acid; and (c) use all onsite storage facilities to their safest maximal extent.
[5] BASF has not appealed the imposition of these conditions.
[6] The wording of paragraph (G) of LSA-R.S. 30:2193 excludes the paragraph (G) applicant from the application of other provisions of section 2193, including the paragraph (E)(2) requirements applicable to "[a]ny person seeking an exemption." Section 33:V.2271 of the Louisiana Administrative Code also applies only to "[a]ny person seeking an exemption." Since the LSA-R.S. 30:2193(G) applicant is not subject to the LSA-R.S. 30:2193(E)(1) land ban, such an applicant needs no exemption and is not therefore subject to either LSA-R.S. 30:2193(E)(2) or LAC 33:V.2271.
[7] We note that although LSA-R.S. 30:2193(G) states that the statute does not apply to the land disposal of hazardous waste by injection well where an exemption has been granted by the United States Environmental Protection Agency and a permit has been issued by the Louisiana Office of Conservation, LSA-R.S. 30:2193(G)(3) requires a determination by the DEQ Secretary that "there are no economically reasonable and environmentally sound alternatives to the injection of such hazardous waste."
[8] Because this case involved a final permit action by the DEQ Secretary, LSA-R.S. 30:2050.21(A) authorized consideration by the Nineteenth Judicial District Court of the initial appeal by the appellants in this matter.
[9] Since the lodging of this appeal, DEQ has promulgated LAC 33:V.2273, which specifies a separate procedure applicable to LSA-R.S. 30:2193(G) petitions, and which states that the "requirements of R.S. 30:2193(A)-(F) and LAC 33:V.2205-2271 shall not apply to the land disposal of a hazardous waste by injection well excluded under R.S. 30:2193(G)(1)-(3)." See Louisiana Register, Vol. 25, No. 10, pp. 1801-2 (1999).