772 So.2d 715 (2000)
COALITION FOR GOOD GOVERNMENT, Vietnamese-American Community of Amelia, Louisiana and Catholic Social Services of the Diocese of Houma-Thibodeaux
v.
The LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY.
Terrebonne Parish Consolidated Government, Individually and on Behalf of the Citizens of Terrebonne Parish and the City of Morgan City, Individually and on Behalf of the Citizens of Morgan City
v.
The Louisiana Department Of Environmental Quality.
No. 99 CA 2843.
Court of Appeal of Louisiana, First Circuit.
October 18, 2000.
Rehearing Denied December 12, 2000.
*718 Charley Hutchens, Lafayette, for Plaintiffs Appellees/Cross-Appellants Coalition for a Good Environment, et al.
Herman Robinson, Jackie M. Marve, Donald Trahan, Andrea' Z. Jones, Baton Rouge, for Defendant Appellant/Cross-Appellee Louisiana Department of Environmental Quality.
Henry C. Perret, Jr., Boyd A. Bryan, Lafayette, for Defendant Appellant/Cross-Appellee GTX, Inc.
Ramona N. Wallis, Houma, for Defendant Appellee Terrebonne Parish Consolidated Government.
James M. Garner, Martha Y. Curtis, Keith A. Kornman, New Orleans, for Amici Curiae Appellees/Cross-Appellants Environmental Technology Council, ENSCO and Von Roll American, Inc.
David R. Case, Washington, D.C., for Amici Curiae Appellee/Cross-Appellant Environmental Technology Council.
Before: FOIL, FOGG, and KUHN, JJ.
FOGG, J.
This appeal involves the permitting of a commercial hazardous waste incineration facility located in St. Mary Parish, Louisiana. The Louisiana Department of Environmental Quality (DEQ) issued a Hazardous Waste Operating Permit, an Air Quality Permit, and an Louisiana Pollutant Discharge Elimination Systems (LPDES) Water Permit for the facility to GTX, Inc. The district court reversed the action of the agency and this appeal followed.

FACTS AND PROCEDURAL POSTURE
The proposed facility is a hazardous waste treatment, storage and incineration facility which will accept hazardous waste for thermal treatment in an incinerator system. It is located at 9828 Highway 90 East between Morgan City and Amelia, Louisiana and consists of approximately 48.228 acres. It is bounded by privately owned property to the north, U.S. Highway 90 to the east, the Bayou Boeuf segment of the Intracoastal Waterway (BBS-IWW) *719 to the west, and the property of Recycling Park, Inc. to the south.
The facility was previously operated by Pelican State Lime, a subsidiary of Dravo, for the manufacture of hydrated and quick lime. In 1984, Marine Shale Processing (MSP) purchased the facility and modified it to process Nonhazardous Oilfield Waste. Subsequently, MSP also began processing waste that qualified as hazardous pursuant to the Resource Conservation and Recovery Act (RCRA) and Louisiana law. This led to various judicial proceedings and litigation between MSP and regulatory agencies, regarding MSP's status as recycler rather than incinerator, and regarding alleged violations of state and federal environmental requirements. MSP ceased operation of the facility in 1996.
In February of 1998, MSP, GTX, DEQ, and other parties executed a consent decree in federal court. Pursuant to the consent decree, GTX obtained an option to purchase the facility. The option would be exercised if GTX obtained the necessary permits to operate the facility as a hazardous waste incinerator. As required by the consent decree, GTX submitted the applications for hazardous waste, air and water permits. On February 19, 1999, DEQ issued the permits that are the subject of this judicial review. Along with the issuance of the permits, DEQ issued its Consolidated Basis for Decision (CBFD).
After the granting of the permits, two groups of citizens organizations filed petitions for judicial review pursuant to LSA-R.S. 30:2050.21. One petition was filed by the Coalition for a Good Government, Vietnamese-American Community of Amelia, Louisiana and the Catholic Social Services of the Diocese of Houma-Thibodaux (hereinafter collectively referred to as the "citizens groups"). The other petition for judicial review was filed by the Terrebonne Parish Consolidated Government, individually and on behalf of the citizens of Terrebonne Parish, and the City of Morgan City, individually and on behalf of the citizens of Morgan City.[1] Upon motion of DEQ, the petitions were consolidated for consideration and decision.
After the filing of briefs by the parties, the district court remanded the matter to DEQ, requesting additional analysis and explanation on the following issues: (1) whether the evidence in the record supports the decision to grant GTX's request for an alternative to the 200-foot buffer zone requirement of LAC 33:V.1503 .C.3; (2) whether DEQ should perform review and consideration of EPA's risk assessment; (3) whether the regulations in effect at the time DEQ issued the GTX permit were adequate; and (4) whether DEQ needed to promulgate any regulations prior to DEQ's decision on the foregoing issues. However, the district court did not limit DEQ's review on remand to those issues it specifically identified. The petitioners and GTX, along with the Environmental Technology Council, Von Roll, Inc., and ENSCO (hereinafter collectively referred to as the "amici curiae"), submitted additional information to DEQ for its review. DEQ supplemented the administrative record with this information and filed with the district court its Supplemental Basis for Decision (SBFD).
Subsequently, on October 19, 1999, the district court entered judgment vacating the issuance of all three permits. In reaching this decision, the district court found that: (1) DEQ exceeded its statutory authority by issuing a permit to a commercial hazardous waste incineration facility prior to the promulgation of rules and regulations required by LSA-R.S. 30:2011 D(24)(a); (2) DEQ erred in not requiring a 200-foot buffer requirement or its equivalency as set forth in LAC 33:V.1503.C.3; and (3) DEQ erred in not requiring a 50-foot buffer as set forth in LAC 33:V.2113.
*720 Pursuant to LSA-R.S. 30:2050.31, this appeal followed. Before this court, DEQ and GTX assert the district court erred in reversing the decision of the agency. The citizens groups argue that the permits were properly vacated for the reasons stated by the district court and for various additional reasons. The amici curiae also filed briefs with this court. We will address each argument in the order that logic requires.

DEQ'S AUTHORITY TO GRANT A HAZARDOUS WASTE PERMIT
On appeal, DEQ and GTX assert the district court erred in determining that DEQ exceeded its statutory authority in issuing a permit to a commercial hazardous waste incineration facility prior to the promulgation of the rules and regulations required by LSA-R.S. 30:2011 D(24)(a). That provision, added by Acts 1991, No. 993, § 1, effective July 24, 1991, provides:
Notwithstanding any other provision of the law to the contrary, the secretary shall issue no permit that authorizes the construction or operation of any new or expanded commercial hazardous waste incineration facility of any type until rules and regulations are promulgated which govern the design, siting, construction, operation, emissions limitations, and the disposal methods of incineration facilities.
DEQ and GTX submit that extensive regulations governing the "design, siting, construction, operation, emissions limitations, and the disposal methods of incineration facilities" were already in existence prior to the enactment of the statute. In support, they refer to the following regulations contained in the Hazardous Waste and Hazardous Materials section of the Environmental Regulatory Code, most of which were enacted in 1984: 33:V.3107 (Waste Analysis); 33:V.3109 (Principal Organic Hazardous Constituents); 33:V.3111 (Performance Standards); 33:V.3113 (Hazardous Waste Permits); 33:V.3115 (Incinerator Permits for New or Modified Facilities); 33:V.3117 (Operating Permits); 33:V.3119 (Monitoring and Inspections); and 33:V.3121 (Closure). Additionally, they cite 33:V.303 (Overview of the Permit Program); 33:V.311 (Establishing Permit Conditions); and 33:V.321 (Modifications of Permits), which are other, more general, rules and regulations for the permitting of treatment, storage and disposal facilities.
The citizens groups contend, however, that even if the above regulations address all matters specified in LSA-R.S. 30:2011 D(24)(a), the statute requires that DEQ either promulgate new regulations or repromulgate existing regulations after the statute's enactment in 1991, which it failed to do. Applying the rules of strict statutory construction to Section 2011 D(24)(a), the language requires only that DEQ have rules and regulations in place prior to the issuance of a permit; it does not require that DEQ promulgate new rules or repromulgate existing rules.
The citizens groups alternatively argue that the existing rules relied upon by DEQ are insufficient to comply with Section 2011 D(24)(a). However, they allege no particular deficiencies in these rules, and we have found none. DEQ promulgated rules governing the design, siting, construction, operation, emissions limitations and the disposal methods of incineration facilities prior to 1991. We have carefully reviewed these rules and find that they are sufficient to comply with requirements of LSA-R.S. 30:2011 D(24)(a). The trial court erred in determining otherwise.
Applying this analysis, we likewise reject the citizens groups' contention that DEQ exceeded its statutory authority in issuing the GTX permit prior to the promulgation of rules and regulations required by LSA-R.S. 30:2178, amended by Acts 1989, No. 776, § 1, effective July 9, 1989, which provides in pertinent part:
A. The secretary shall prior to the issuance of any permit for a commercial hazardous waste treatment, storage, or *721 disposal facility, assess the impact of the location of the facility on the citizens in the surrounding area, the local infrastructure, and on the environment. He shall adopt rules and regulations consistent with this Section establishing criteria for making this determination and prior to any determination on the permit issue a report summarizing his findings. He shall also request from the local governmental subdivision a report detailing the impact of the facility on the local infrastructure including but not limited to roads and transportation systems, schools, medical institutions, police and fire departments, and such other matters as the local government may determine will be impacted by the facility.
Once again, this statute requires only that DEQ promulgate rules and regulations prior to a determination on the permit; it does not require that DEQ promulgate new rules or re-promulgate existing rules. DEQ had rules and regulations in place consistent with the criteria set forth in Section 2178 prior to the statute's enactment date and, thus, did not exceed the statutory authority granted by that legislation in issuing permits to GTX.

STANDARD OF REVIEW
The standard of judicial review of a decision by DEQ to grant a permit is set forth in LSA-R.S. 49:964 G. That statute provides as follows:
G. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
In the case of Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152, 1159 (La.1984), the Louisiana Supreme Court stated that the "test of § 964 G(6) is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion."
GTX asserts the district court incorrectly applied LSA-R.S. 49:964 G(6) in reaching the three bases on which it vacated the permits. Each of the district judge's reasons for reversing the granting of these permits involve the interpretations of revised statutes and agency rules. To reverse the agency on those grounds involves a determination of whether the actions of the agency were "in violation of constitutional or statutory provisions," whether they were "in excess of statutory authority of the agency," or whether they were "affected by other error of law" as set forth in LSA-R.S. 49:964 G(1),(2) and (4). See Save Ourselves, 452 So.2d at 1158. As no factual issues were present in the district court's determinations, LSA-R.S. 49:964 G(6) was inapplicable. See Save Ourselves, 452 So.2d at 1159.
*722 In the case of Save Ourselves, the Louisiana Supreme Court also determined that, in order to assure that the agency has acted reasonably in accordance with law, the agency is required to make basic findings supported by evidence and ultimate findings which flow rationally from the basic findings; and it must articulate a rational connection between the facts found and the order issued. Save Ourselves, 452 So.2d at 1159. The court stated:
The agency is required to use a systematic, interdisciplinary approach to evaluation of each hazardous waste project or facility. In determining whether the proposed project fully minimizes adverse environmental effects, the commission [DEQ] necessarily must consider whether alternate projects, alternate sites, or mitigative measures would offer more protection for the environment than the project as proposed without unduly curtailing non-environmental benefits. (Citation omitted).
Save Ourselves, 452 So.2d at 1157.
In the Save Ourselves decision, the supreme court set forth a number of factors to be considered by DEQ when employing a cost-benefit analysis in determining whether to grant or deny a permit for a proposed facility. Matter of Supplemental Fuels, Inc., 94-1596 (La.App. 1 Cir. 5/9/95), 656 So.2d 29. In Matter of Rubicon, Inc., 95-0108, p. 12 (La.App. 1 Cir. 2/14/96), 670 So.2d 475, 483, this court summarized those considerations into three categories:
[A]ny written finding of facts and reasons for decision must satisfy the issues of whether: 1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; 2) a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrate that the latter outweighs the former; and 3) there are alternative projects or alternative sites or mitigating measures which would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable.
We reject the general allegation of the citizens groups that the CBFD and SBFD do not adequately comply with these dictates. Having reviewed the record, we find that the CBFD and SBFD thoroughly discuss alternative projects, alternative sites, and mitigative measures, while analyzing the pertinent costs and benefits. The information and analysis provided is sufficient to review the agency's exercise of the discretion vested in it by the constitution and the statutes. Therefore, the CBFD and SBFD provided by DEQ adequately comply with the Save Ourselves and Rubicon decisions.

JUDGMENT OF THE DISTRICT COURT
We now turn to the merits of this case. In addition to the determination that DEQ lacked the authority to issue the permits as discussed above, the district court found the permits were improperly granted because DEQ failed to require compliance with LAC 33:V.1503.C.3 and LAC 33:V.2113. These conclusions are challenged by DEQ and GTX.

1. COMPLIANCE WITH LAC 33:V.1503.C.3
The district court found that DEQ failed to comply with the requirements of LAC 33:V.1503.C.3 "by eliminating the 200-foot buffer requirement or its equivalency" on the west boundary of the site. The west side of the site is bordered by the BBS-IWW, which is a navigable waterway. The permit allows several tanks, the rotary kiln, and container storage and processing areas to be situated within 200 feet of the bayou.
LAC 33:V.1503.C.3 provides, in pertinent part, as follows:
3. Buffer Zone

*723 a. General Requirement. Sites shall be shielded from adjoining non-compatible land uses by space, natural separation, or other means acceptable to the administrative authority.
b. Minimum Requirements. In no event shall the buffer be less than that stated for the following sites:
i. Sites zoned industriallySufficient space for security and drainage control facilities; or
ii. All other locations200 feet between any facility (treatment pond, incinerator, tank, etc.) and property line unless a proper buffer is installed which is acceptable to the administrative authority (see LAC 33:V.2113 for container requirements).
GTX and DEQ assert the buffer provided by the permit is "acceptable to the administrative authority" as required by Subsection (b)(ii) and the site is "shielded from adjoining non-compatible land uses by space, natural separation, or other means acceptable to the administrative authority" as required by Subsection (a). They contend that DEQ's decision to accept the buffer is not arbitrary, capricious, or an abuse of discretion.
It is undisputed that the GTX site is not located in an area that is zoned industrial. The citizens groups assert, pursuant to LAC 33:V.1503.C.3.b, DEQ could not issue a permit to GTX unless it determined either that: (1) there is 200 feet between any facility and GTX's property line, or (2) a "proper" and "acceptable" buffer is "installed." In making this argument, the citizens groups contend the language requires that the permittee actually install a buffer. We find the language to be less restrictive than that proposed by the citizens groups. The rule states that a 200-foot buffer is required "unless a proper buffer is installed which is acceptable to the administrative authority." Under this provision, DEQ may consider the particular circumstances of a site, including the natural characteristics and the changes proposed by the permittee, and determine whether it is "shielded from adjoining non-compatible land uses by space, natural separation, or other means" as required by Subsection (a). Only an abuse of the agency's discretion or an arbitrary or capricious action by the agency in determining that a buffer is acceptable will render that decision reversible. See LSA-R.S. 49:964 G(5).
An analysis of the record reveals that the facility as permitted provides adequate shielding. Although it is not zoned, the area in which the facility is located has much heavy industrial development. The president of the Parish Council testified by affidavit that, if the area were to be zoned, it would be zoned industrial.
GTX is required to construct a rip rap bank bordering the BBS-IWW, and install a 6-foot chain link fence topped with barbed wire to prevent ingress to the facility. The section of Bayou Boeuf adjacent to the facility serves as part of the Intracoastal Waterway, and is primarily used as an industrial waterway. The bayou is more than 500 feet wide adjacent to the facility. The navigational channel is 150 feet wide and begins 170 feet from the bank of the facility. The vast majority of vessels in this area will be in transit in the navigation channel. An average of thirty vessels pass the GTX waterfront during a typical 8-hour daytime period. The nearest land that can be built upon is 510-570 feet from the property line across the BBS-IWW.
AX-29 and AX-30, which are container processing areas within 200 feet of the bayou, have a common concrete containment system with a collection sump to prevent contamination of the soil or underground in case of spills. AX-30 contains a foam and water fire suppression system in the event of fire or explosion and a seven-foot steel reinforced concrete wall along the length of the BBS-IWW. It will be enclosed and utilize a regenerative thermal oxidizing unit to eliminate organic vapors and fugitive emissions. GTX will maintain *724 surveillance cameras in these areas which will be monitored constantly by control room personnel.
Most of the material being held in the tanks will be intermediate material such as incinerator ash from the kiln, baghouse residue, and disentrained solids. This material has already undergone incineration and is no longer combustible.
In the SBFD, DEQ stated, "In considering the totality of the circumstances ..., the Department has determined that the probability of harm from the facility as authorized by the permit is sufficiently low enough to justify the existence of the units within 200 feet of the property line." DEQ decided that, considering the location of the facility and the nature and use of the bayou, the facility as permitted can be operated without undue risk of harm to anyone off-site thereby providing a "proper" buffer zone. The circumstances of this boundary support that conclusion.
In summary, DEQ'S action with respect to LAC 33:V.1503.C.3 is supported by a preponderance of the evidence. See LSA-R.S. 49:964 G(6). It is not arbitrary or capricious, and does not constitute an abuse of discretion. See LSA-R.S. 49:964 G(5).

2. COMPLIANCE WITH LAC 33:V.2113
The district court found that DEQ violated LAC 33:V.2113 by allowing GTX to transport containers through the 50-foot buffer zone mandated by that regulation. GTX and DEQ assert the district court erred in its application of LAC 33:V.2113 as this regulation prohibits containers of ignitable or reactive waste from being placed for storage within the 50-foot buffer zone, but does not prohibit the mere movement of such containers through the 50-foot zone. LAC 33:V.2113 provides that "[c]ontainers holding ignitable or reactive waste must be located at least 15 meters (50 feet) from the facility property line."
Condition III.F.10 of the GTX permit states:
Drums containing hazardous waste shall not be placed for storage in any location that is less than fifty (50) feet from the facility property line. Drums placed on conveyors on the AX-4 outer conveyor system, AX-29, and AX-30 conveyors may be located less than 50 feet from the facility boundary, provided such drums are in transit and are actively being introduced to the process unit. In the event of a process unit upset or shut down, the Permittee must immediately begin removal of drums from the process area and its related equipment into permitted hazardous waste container storage areas. Under such circumstances, all drums must be removed from the process area with in (sic) twenty-four (24) hours of the original unit shut down.
All permitted storage areas for containers of ignitable or radioactive wastes are more than 50 feet from any property line. The conveyors at AX-29 and AX-30 will receive shipments of hazardous waste drums by barges docked just outside the facility boundary at Bayou Boeuf.
With respect to the 50-foot buffer zone, the citizens groups contend that nothing in Section 2113 limits the prohibition to stored containers; rather, the requirement that no containers be "located within 50 feet of the boundary" means the conveyor belt used to transport the waste is in violation as the belt is a part of the hazardous waste facility.
The regulatory program for containers is set forth in Title 33, Chapter 21 of the Louisiana Administrative Code. Section 2101, the applicable provision of Chapter 21, provides:
The regulations in this Chapter apply to owners and operators of all hazardous waste facilities that store containers of hazardous waste, except as specified in LAC 33:V.105.D, or if the container is empty (see LAC 33:V.109).
*725 Clearly, this section provides that Chapter 21 applies to the storage of containers. There is no language contained within the subpart containing LAC 33:V.2113 that suggests that "located" encompasses a wider scope of activities than discussed in Section 2101. Rather, the entire chapter is devoted to the proper storage of containers containing hazardous waste and materials. Consistent with this provision, it follows that Section 2113, the regulation specifically addressing ignitable and reactive waste, was intended to regulate the storage of containers of those wastes, not the movement or transportation of those containers. The district court erred in determining otherwise.
Additionally, the citizens groups assert that, by permitting GTX to transport and process drums of ignitable waste within 50 feet of the bayou, DEQ is interpreting its rules in a manner that is less stringent than the federal regulations and it is illegal to do so. To support this argument, they refer to a letter written by Lynn Dial, an EPA Region VI staff official. However, the district court denied the citizens groups' motion to supplement the record with this and other documents;[2] therefore, it is not properly before this court. Furthermore, we find nothing in the record, and the citizens groups have referred this court to nothing in the record, that would support the assertion that EPA had any difficulty with the transport of these tanks through the 50-foot buffer zone. Therefore, we find no merit to this contention.

Alternative Arguments Raised by the Citizens Groups in Support of the District Court Judgment
In further support for the district court's judgment, the citizens groups rely on the following specific allegations of deficiencies in the permits:

1. Alternative Projects
The citizens groups assert that the evidence fails to support DEQ's conclusion in the CBFD that no alternative projects would provide greater environmental protection without unduly curtailing non-environmental benefits. In response, DEQ maintains that its conclusion is supported by the evidence in the record.
In the CBFD, DEQ discussed the technology employed by GTX as follows:
The incineration process consists of a countercurrent flow rotary kiln[3] as the primary combustor, with two oxidizers... as the secondary combustion section. It also includes two vitrification units, the No.1 and 2 evaporative cooling towers, activated carbon and lime injection systems, six parallel bag filters (three newwith five bag filters operating, one standby filter), two induced draft fans, parallel HCI/SO2 scrubbers and a new 160 foot stack.
Solid feed (nonpumpable material) enters the kiln through a feed chute located at the raised feed end of the kiln adjacent to the secondary combustor. As the kiln rotates, these materials are slowly conveyed toward the lower discharge end of the kiln. A low NOx natural gas burner and a pumpable hazardous waste feed nozzle are located at the lower end of the kiln and extend into the kiln through penetration in the kiln face (hood). This arrangement supplies heat by the combustion of natural gas and liquid hazardous waste (i.e., pumpable).
Draft fans pull the air and combustion products countercurrent to the solid material *726 flow. As the solids travel through the kiln, they are heated by the combustion gases where they are dried, combusted, or volatilized. Normal residence time for solids in the kiln is 120 to 150 minutes. Solids exit the kiln through planetary coolers that cool the solids and preheat the combustion air. Solids may be conveyed into containers for shipment off-site or screened to separate "intermediate material" from large pieces of scrap metal and rock. Intermediate material is conveyed to temporary storage pending testing. Large material that does not fall through the screen is magnetically separated and the metal is sold as scrap.
In the kiln, volatile/combustible compounds are removed from the solids, thus reducing the volume of material. Combustion gases, vaporized materials and entrained fine solids exit from the raised section feed end of the kiln where it projects into the top of the No. 1 Oxidizer. The secondary combustor consists of two refractory lined, water cooled, vertical oxidizers used to completely burn the gases exiting the rotary kiln. Pumpable hazardous material is injected into the oxidizers as supplemental fuel. Gas residence time in the secondary combustor is greater than two seconds at temperatures above 1600. The oxidizers will also be used as high temperature furnaces for vitrifying intermediate materials and air pollution control equipment residues (e.g., baghouse dust, disentrained solids).
GTX proposes to retain the vitrification process as used by its predecessor, whereby intermediate material, the kiln ash, dry scrubber solids, and baghouse dust are returned to the secondary combustion chambers, and heated to fusion (melting) temperatures. The slagged material then flows by gravity to two vitrification chambers, where the material is further heated to complete melting, after which it is cooled and re-solidified to a glass-like form in a water bath. The Department finds that the vitrification process stabilizes the residuals from the incineration process so that when disposed in a permitted landfill, the environmental risk is reduced.
In addition to the GTX incinerator process, DEQ also considered a number of alternative projects for the treatment of RCRA hazardous waste. These projects, which were the only technologies besides the GTX incinerator to have been demonstrated on a full-scale commercial basis, were identified in a report commissioned by Focus Environmental, Inc., as follows: (1) Eco Logic Gas Phase Chemical Reduction Reactor, a process that treats organic hazardous waste in a non-oxidative hydrogen rich atmosphere at approximately 1650 and ambient pressure to produce a fuel gas as reaction products from the wastes; (2) GTS Duratek Electric, Joule-Heated Glass Melter, a process that uses glass-making technology to encapsulate waste constituents into a glass matrix; (3) Molten Metals Catalytic Extraction Process, a recycling process that treats inorganic and organic hazardous waste in a non-oxidative refractory lined molten metal bath; (4) Retech Plasma Arc Centrifugal Treatment Process, a process that treats inorganic and organic waste using a plasma torch located in a melter chamber; and (5) Scientific Ecology Group Steam Reforming Process, a process that treats inorganic and organic wastes by evaporating hydrocarbons in the waste in a waste feed evaporator using superheated steam, then feeding the gases from the evaporator to a detoxification reactor where electrical heating and additional superheated steam is used to raise the temperature of the gases to about 2100 to 2200 where the steam reforming reaction is essentially completed. These alternative processes were compared to the proposed GTX incinerator using the following evaluation criteria: (1) technology status; (2) waste liquids and solids capability; (3) waste liquids and solids capacity; (4) regulatory performance; and (5) process residuals.
*727 Application of these criteria showed that, of the six hazardous waste technologies above, the proposed GTX incinerator had the most advanced technology status. It was the only technology in the mature commercial operation stage, having been in operation from 1985 until 1996 and having treated 855,000 tons of a complex liquid and solid waste profile. The five alternative technologies were in the early stages of commercial development; all started commercial operation in either 1995 or 1996 and none had treated more than 500 tons of hazardous or radioactive waste through about March of 1997. The alternative technologies generally had limitations on the types of wastes that could be treated successfully, while the GTX incinerator had the proven capability to treat a broad, complex liquids and solids waste profile. The GTX incinerator also had the largest waste liquids and solids throughput capacity, 440,000 tons per year. In contrast, the design capacities of the five alternative processes ranged from about 200 to 30,000 tons per year. The liquids and solids capability and capacity of the GTX facility are considered important competitive requirements, as they result in significant economic savings to industrial users of the facility.
On the issue of regulatory performance, the evidence suggested that all six hazardous waste technologies, through the use of air pollution control equipment, likely would meet or exceed the requirements of the applicable proposed or promulgated regulations and guidelines. However, the inorganic and organic emissions from the alternative technologies were not as well-defined as the emissions from the GTX system, because only the GTX system had been stack tested while continuously treating a broad, complex liquid and solid waste profile. Finally, the GTX incinerator produced no liquid process residuals, only a solid vitrified ash which had excellent leach resistance and consistently passed the DEQ Land Disposal Restrictions. No DEQ Land Disposal Restrictions data was available on the five alternative processes due to their developmental status.
DEQ reviewed and analyzed the above evidence and, based on its knowledge of accepted engineering and scientific principles, determined that no alternative project would offer more protection to the environment than the proposed GTX incineration facility without unduly curtailing the non-environmental benefits. This determination is not arbitrary or capricious, and it does not constitute an abuse of discretion.

2. Alternative Sites
Regarding alternative sites, the citizens groups assert that the evidence fails to support DEQ's conclusion that no alternative site would provide greater environmental protection than the proposed Amelia site without unduly curtailing the non-environmental benefits. They contend that the record reflects evidence that DEQ's alternative sites analysis was driven by DEQ's desire to implement its consent decree with MSP and GTX and its concern that costs on another site would be prohibitive. DEQ asserts that it is not concerned with the profitability of the facility, but maintains that the initial cost of the project at a particular location is properly one of the non-environmental impacts it must consider in balancing the competing factors of alternative sites.
In making its determination regarding alternative sites, DEQ relied upon an independent, third party siting study performed by Burk-Kleinpeter, Inc. (BKI). In connection with the study, BKI's environmental consultants performed an indepth analysis of potential sites across the entire continental United States and identified the following six basic categories of sites considered for the establishment of a new hazardous waste incinerator operation: (1) Greenfield; (2) Undeveloped Industrial; (3) Brownfield; (4) Cement Kiln; (5) Captive Incinerator; and (6) Commercial Incinerator.
*728 Greenfield sites, those which have never been developed for industrial activity, and undeveloped industrial area sites, those located in an area of industrial activity, but which do not have an existing industrial facility, offer the most flexibility in terms of development. However, they are considered the most environmentally and economically disadvantageous and, thus, were removed from consideration as potential sites for the facility. Brownfield sites are industrial sites with known contamination, which may or may not have infrastructures in place. These sites were eliminated from consideration because of the potential for incompatibility between the existing contamination and the hazardous waste to be treated, stored or incinerated, and because remediation and permitting delays were considered cost-prohibitive. Cement kilns are facilities that operate for production of cement. Basic differences between cement kilns and hazardous waste incinerators necessitate extensive structural and operation conversions; therefore, cement kilns were not considered as potential sites. Captive incinerators, those operated by a company for disposal of its own waste, generally are designed to handle only specific types of waste. Additionally, purchase of a captive incinerator would involve the purchase of another type of industry and would require conversion of the incinerator for use as a hazardous waste incinerator. The impracticality of converting existing industries eliminated these types of facilities from further consideration.
Finally, a total of eighteen active and inactive commercial incinerator sites were identified and considered. These facilities had existing infrastructures which could be refurbished at acceptable capital improvement costs, and, since the sites were existing, minimal environmental impact was anticipated. Commercial incinerator sites also were deemed to have the least environmental and economical impact. Accordingly, these sites became the focus of the alternative site selection analysis.
BKI developed and implemented a two-tiered approach in evaluating the eighteen commercial incinerator facilities as prospective sites, which was fully discussed by DEQ in its CBFD. The Tier I criteria were: (1) proximity to waste generation sites (locations within 500 miles of the center of hazardous waste activity); (2) transportation access (locations with access to major highways, railroads and navigable waters); and (3) size (locations of a minimum size of 25 acres). These criteria were applied on a pass/fail basis. After application of these criteria, only four sites remained for further consideration: the proposed GTX facility located in Amelia, Louisiana; the first Rollins site located in Deer Park, Texas; the LWD, Inc. site located in Calvert City, Kentucky; and the second Rollins site located in Baton Rouge, Louisiana.[4]
Next, the Tier II criteria[5] were applied. These criteria were divided into the following categories, which graded each site in terms of environmental risk: (1) human health (16 criteria, 60% of total score); (2) water and air quality (11 criteria, 15% of total score); (3) ecological (6 criteria, 15% of total score); and (4) miscellaneous (6 criteria, 10% of total score). Human health criteria included the facility's distance from public buildings, the population residing within prescribed distances, the potential impact to the local food supply and the possibility that the incinerator could worsen any existing community *729 health problems. Water criteria included the number and distance from area drinking water wells, documented groundwater contamination near the site and surface water uses. Air criteria were limited to the volume of annual parish/county emissions and the distance to the nearest non-attainment area. Ecological criteria included the proximity of wetland and wildlife management areas, the presence of endangered species within one mile of the facility, the permeability of soils beneath the site and the location of the site with respect to the 100-year floodplain and area aquifer recharge zones. Miscellaneous criteria included the site's location relative to nearby solid and hazardous waste disposal sites and local inactive and abandoned hazardous waste sites, and the soil properties and number of dischargers of hazardous waste and toxic substances within one mile of the facility.
Each criterion was assigned a value of zero to three, with three having the most impact. Individual criteria scores were summed for each category and multiplied by a weighting factor, the percentage of the total score based on its significance, to arrive at a score for each category. Totals for each category then were added to give a final score for each facility. The facility with the lowest score was assumed the most favorable. Of the four facilities considered, the Amelia site received the lowest score.
Major factors contributing to the Amelia site's leading rank were that all public structures except one church were located greater than one mile away; the closest residence was greater than one mile away; the population within the two and three mile radius was less than 1,000 and 5,000, respectively; the site was in an air quality attainment area; there were no air quality non-attainment parishes adjacent to the site; there were no drinking water wells within one mile of the site; the toxic release inventory (TRI) emissions[6] in the parish were less than ten million pounds per year; there were no endangered species habitat or wildlife management areas within one mile of the site; the site was not located on an aquifer recharge area; the soil properties were adequate to support structures; and the distances to the nearest hazardous waste disposal and solid waste sites were greater than one mile.
Edward Overton, Ph.D., an Environmental Analytical Chemist for the Institute for Environmental Studies at Louisiana State University, testified at the evidentiary hearing as an expert in chemical hazard assessment and prioritizing environmental risks. Dr. Overton conducted an independent critique of the BKI Alternative Siting Study. He evaluated only the two-tiered approach employed in the study and was provided no data to ensure that his critique was completely objective. Dr. Overton concluded that the study thoroughly considered all possible routes for impacting the environment and "resulted in the best possible procedure for evaluating alternative sites for locating a hazardous waste facility." He felt that the study went "well beyond" EPA guidance documents and was the "most comprehensive" study he had ever seen.
We have carefully reviewed DEQ's alternative sites selection analysis and find no evidence, as the citizens groups contend, that the selection of the Amelia site was fueled by DEQ's desire to implement the consent decree or to eliminate sites solely on the basis of excessive cost. Rather, DEQ's analysis was based on what was, arguably, the most rigorous and comprehensive alternative sites evaluation ever utilized. We find no abuse of discretion, arbitrariness, or capriciousness in the selection of this site.

3. Mitigating Measures
The citizens groups further assert that the evidence does not support DEQ's *730 conclusion that it has required all mitigating measures necessary to reduce any adverse environmental impact. Primarily, their arguments concern the contingency measures imposed by DEQ in the event of a hurricane or flood.[7]
In the event of a hurricane or flooding, GTX's Contingency and Preparedness Plan generally provides that the facility will immediately cease acceptance of hazardous waste and then increase the feed rate to process as much stored material as possible before shut down of the process becomes unavoidable or necessary. Critical on-site tanks will be filled to capacity with bayou water to prevent floating in flood situations; any such bayou water then would be considered a hazardous waste and managed accordingly. Also, sandbags will be used to create a barrier to floodwaters around the perimeters of the berm,[8] levee and process areas.
The citizens groups criticize the rapid burning of hazardous waste, the tainting of bayou water with hazardous waste, and the reliance of sandbagging to create a barrier to floodwaters. They suggest DEQ instead should have required GTX to transport hazardous waste off-site in the event of a flood, develop a plan to secure the critical tanks from floating that does not involve the contamination of bayou water, and raise the railroad tracks to a height above the floodplain to eliminate the necessity of a gap in the berm.
We are unconvinced by the citizens groups' arguments that the measures imposed by DEQ are insufficient. It is clear that the suggestions by the citizens groups are merely alternatives to the mitigative measures already required by DEQ, which likely are superior to those proposed by the citizens groups.
In their brief, the citizens groups claim that DEQ failed to require any mitigating measures, when, in reality, DEQ has required numerous mitigating measures, such as limiting the types of hazardous waste that can be processed at the facility, restricting the discharge of waste water, and requiring above-ground piping for easy inspection, leak detection and maintenance. And, in response to concerns raised by the public, DEQ also required additional monitoring, including "real time" monitoring of operating parameters, a full time DEQ inspector present at the facility, and a Community Monitoring Plan to assess off-site ambient air conditions, perimeter monitoring and biomonitoring.
DEQ detailed many of the substantial mitigative measures imposed on GTX in the CBFD. Numerous other measures not cited in the CBFD were set forth in the permits. After carefully examining the treatment process employed by GTX, DEQ concluded it had required all mitigating measures necessary to reduce any adverse environmental impact. In this determination, there is no abuse of discretion.

4. Hurricanes and Flood Waters
Next, the citizens groups contend that the facts in the record do not support DEQ's conclusion that GTX has complied with LAC 33:V.1503.B, which requires protection from hurricane waters and flood waters. As such, they assert that the permits as issued are invalid.
Initially, the citizens groups complain that the record does not contain a certification from a qualified professional engineer *731 stating that the site is protected from the entry of hurricane water by natural or created barriers as required by LAC 33:V.1503.B.4. DEQ essentially admits that the record is devoid of a proper certification, but reminds us that the berm, the proposed "created barrier" that will protect the facility from the entry of hurricane water, has not yet been constructed. The permit requires that the berm be built after the issuance of the permit but prior to the acceptance of hazardous waste. DEQ assures that, after construction is completed, there will be an inspection by a professional engineer to certify that the berm was built in accordance with the specifications contained in the permit application. Moreover, we note that LAC 33:V.1503.B.4 is not located in the chapter of Title 33 that sets forth the requirements for "Permitting." Rather, it is located in Chapter 15, which concerns the operating standards which must be met by "Treatment, Storage or Disposal Facilities" prior to the acceptance of hazardous waste.
On the issue of floods, the citizens groups argue that the facility will not be constructed to prevent washout of hazardous waste as required by LAC 33:V.1503.B.3.a. In support, they reurge their earlier argument that GTX's mitigative measure to sandbag at the railroad gap in the berm will not prevent the entry of flood waters. The evidence shows that the railroad gap is located on the side of the facility nearest the highway and farthest from the bayou. According to the record, at this location, the flood stage is at seven feet. Thus, based on historic practices, DEQ concluded that sandbags could be stacked of sufficient height to withstand anticipated wave action and water pressure. We find that DEQ's conclusion was reasonable based on the evidence in the record. The citizens groups have failed to show that DEQ issued the permits without ensuring that the facility would be protected from hurricane and flood waters.

5. Risk Assessment[9]
With respect to risk assessment, the citizens groups initially assert that the fact sheet regarding the GTX permit was deficient because it did not notify the public that DEQ was using the EPA as a resource on risk issues, citing LAC 33:V.703.D. The fact sheet stated that "[a] pre-trial burn risk assessment performed by EPA indicated that the technology offered by GTX demonstrates no appreciable risk to health or the environment." We find that this sufficiently placed the public on notice that the determination of risk was through the EPA risk assessment.
The citizens groups also submit that DEQ failed to accept and respond to public comment on conditions imposed through the provisions of LAC 33:V.311.E. That regulation provides essentially that each hazardous waste facility permit issued by DEQ must include terms and conditions the administrative authority determines necessary to protect human health and the environment. The record reveals that DEQ did receive and respond to public comment on this issue. In their brief, the citizens groups offered no more specific assertions of deficiencies in this respect than the general assertion stated above. After reviewing this general allegation, we find no error on behalf of DEQ.
The citizens groups further assert that the results of the risk assessment warranted denial of the permit or the imposition of additional risk-based conditions. Here, too, the citizens groups decline to provide any specific details to support this bare assertion. We have reviewed this general allegation and find no error on behalf of DEQ.
Additionally, the citizens groups assert that DEQ failed to adequately review the EPA risk assessment under Save Ourselves. *732 Earlier in this opinion, we addressed and rejected this argument.

6. Capacity Limits
Finally, the citizens groups assert that DEQ issued GTX's hazardous waste incineration permit in violation of LSA-R.S. 30:2179, the Capacity Statute. The citizens groups assert that this legislation requires DEQ to determine how much hazardous waste capacity the State of Louisiana needs, and prohibits issuance of a permit that would create more than 15% of excess capacity, a task which, they allege, DEQ declined to perform.
LSA-R.S. 30:2179 provides, as follows:
A. (1) Not later than January 1, 1988, the secretary of the Department of Environmental Quality in conjunction with the Hazardous Waste Advisory Board shall begin deliberations concerning the volume and types of solid and hazardous waste reduced, generated, transported, managed, recycled, disposed of or otherwise handled in Louisiana. The secretary and board, concurrent with their deliberations, shall deliberate concerning the capacity of Louisiana to safely and judiciously reduce, generate, transport, manage, recycle or dispose of these wastes.
(2) Not later than January 1, 1989, the secretary shall make a determination, with the counsel of the board, relative to the permitted capacity of Louisiana to safely reduce, transport, manage, recycle, dispose of or otherwise safely handle the solid and hazardous wastes generated within Louisiana.
B. (1) Upon determining the volume and types of solid and hazardous waste generated, reduced, transported, managed, recycled, disposed of or otherwise handled within Louisiana, and upon determining the capacity necessary for Louisiana to safely and judiciously reduce, transport, manage, recycle, or dispose of these wastes, the secretary shall determine the total permitted capacity necessary to manage or dispose of solid and hazardous waste in Louisiana.
(2) The secretary shall ensure that the expansion or modification of existing treatment, storage, or disposal facilities needed to promote improvements in handling, treatment, destruction, or disposal of wastes in Louisiana, and construction of new facilities which would result in the generation of additional waste in Louisiana, be provided for in determining the capacity limits to be permitted. The secretary shall allow additional capacity on a case by case basis when necessary to install facilities with additional capacity for future growth and expansion or for improving, destroying, or disposing of waste generated in the state. The secretary shall allow such additional capacity in a manner which shall encourage and shall not preclude the attainment or maintenance of state-of-the-art waste management capabilities.
(3) The secretary shall ensure that sufficient validly permitted waste handling, treatment, destruction, and disposal capacity exists to safely and efficiently manage or dispose of waste substances in emergency situations or waste substances originating from instate waste sites.
(4) The secretary shall not issue any permits or licenses for the handling, treatment, destruction, and disposal of solid or hazardous waste which would increase the total permitted capacity of Louisiana to manage or dispose of such waste in an amount in excess of fifteen percent greater than the necessary total permitted capacity of this state as determined by the secretary pursuant to Paragraph (1) of this Subsection. The secretary shall reassess on a quarterly basis the capacity necessary to handle, treat, destroy, manage, and dispose of wastes generated in Louisiana and shall insure that there is sufficient capacity to maintain the capacity within Louisiana to so handle, treat, destroy, manage, *733 and dispose of these wastes at the level and in that amount as required in this Paragraph. However, the secretary may vary the total permitted capacity above the fifteen percent limitation for any year by rule adopted in accordance with the Administrative Procedure Act, R.S. 49:950 et seq., provided the secretary finds, based on reliable evidence in the record of a public hearing on the proposed rule, that failure to increase the total permitted capacity above the limitation required by this Section will result within one year in insufficient capacity for the proper handling, treatment, storage, and disposal of solid or hazardous waste generated in the state.
(5) The fifteen percent limitation above the total permitted capacity shall be applied on an aggregate basis and shall not be applied individually to a certain facility.
Section 2179B(2) mandates that DEQ allow additional permitted capacity on a case-by-case basis when necessary to provide additional capacity for treating or disposing of waste generated within the state. It provides that the "secretary shall allow such additional capacity in a manner which shall encourage and shall not preclude the attainment or maintenance of state-of-theart waste management capabilities." The CBFD specifically explains that the "additional" capacity is being provided for waste generated in Louisiana. Therefore, this analysis falls under Subsection B(2), which applies to waste generated within the state; the capacity determination under Section B(1) and the 115% limitation in Subsection B(4) apply to the total permitted capacity and are not applicable.
The CBFD states that Louisiana generates hazardous waste, solids, and sludges which must be sent to commercial hazardous waste incinerators for treatment, but no commercial hazardous waste incinerator capable of handling such wastes currently exists in the state. The record shows that the GTX facility will be the most technologically advanced, state-of-the-art facility in the nation. DEQ anticipates that waste will be diverted from older facilities. Clearly, the statute envisions the permitting of improved and advanced facilities, which utilize technology that is safer, more efficient, and more environmentally-sensitive than the technology used in existing plants. Accordingly, we find no abuse of the agency's discretion in permitting the GTX facility.

CONCLUSION
For the foregoing reasons, the judgment of the district court is reversed and the decision of DEQ is reinstated. Costs are assessed against the Coalition for Good Government, the Vietnamese-American Community of Amelia, Louisiana and the Catholic Social Services of the Diocese of Houma-Thibodeaux.
REVERSED.
KUHN, J., concurs.
NOTES
[1] These parties did not appeal the judgment of the district court and did not file an appellees' brief with this court.
[2] The citizens groups assert that the district court erred in denying their motion to supplement the record. We disagree. The citizens groups attempted to supplement the record after the period on remand during which the district court allowed all interested parties to submit additional information to DEQ. Therefore, the district court did not abuse its discretion in denying the motion to supplement.
[3] The kiln is 275 feet long by 9.5 feet in diameter; it was originally used as a lime kiln.
[4] The Dow facility located in Plaquemine, Louisiana, also received positive responses to each of the criterion. However, the facility was not considered in the Tier II evaluation because it is a captive incinerator.
[5] These criteria mimic EPA's Superfund Hazardous Ranking System, developed to prioritize abandoned sites to determine which sites should be given the highest priority in terms of assessment and cleanup. These criteria also incorporated factors from the Save Ourselves case, DEQ regulations and RCRA regulations.
[6] TRI emissions equal the number of pounds of chemicals that EPA designates as toxic chemicals that are released into the air, water or ground.
[7] The citizens groups also contend DEQ waived numerous environmental laws and regulations with respect to the incinerator waste feed rates, the 200-foot buffer zone and the 50-foot buffer zone. However, these issues have been addressed elsewhere in this opinion.
[8] According to proposed construction plans, the GTX facility will be surrounded by a seven-foot earthen berm on three sides, with a concrete bulkhead and rip rap along the boundary of the bayou. Since trains are incapable of traversing the slope associated with the berm, a gap in the berm will exist on the side of the facility closest to the highway to allow for transport by rail.
[9] With respect to risk assessment, the citizens groups refer this court to the briefs filed by the amici curiae and request that those briefs be incorporated into their brief. We decline to do so.