809 So.2d 225 (2001)
In the Matter of: BELLE COMPANY, L.L.C. Type I and II Solid Waste Landfill Permit.
No. 2000 CA 0504.
Court of Appeal of Louisiana, First Circuit.
June 27, 2001.
*228 James L. Ellis, Edwin W. Fleshman, James C. Carver, Taylor, Porter, Brooks & Phillips, L.L.P., Baton Rouge, for Intervenors-Appellee-Appellant Belle Company, L.L.C.
Suzanne S. Dickey, Tulane Environmental Law Clinic, New Orleans, for Appellant-Appellee Assumption Parish People's Environmental Action League.
Herman Robinson, Jackie M. Marve, Andrea' Z. Jones, Louisiana Department of Environmental, Quality Legal Affairs Division, Baton Rouge, for Appellee Louisiana Department of Environmental Quality.
Before: PARRO, GUIDRY, and WEIMER, JJ.
PARRO, Judge.
This is an appeal by a citizens' group from a decision of the Louisiana Department of Environmental Quality (DEQ) to grant a permit for the construction and operation of a Type I and Type II nonhazardous solid waste landfill to Belle Company, L.L.C. (Belle).

Factual Background and Procedural History
In October 1994, Belle filed an application with the Solid Waste Division of DEQ for a permit for the construction and operation of a Type I (industrial) and Type II (sanitary) solid waste landfill. The proposed solid waste disposal facility would be built on a 340-acre tract owned by Belle located approximately six miles north of the intersection of Louisiana Highway 70 and Louisiana Highway 1 in Assumption Parish. The waste to be disposed at this proposed facility would be generated in Louisiana from industrial, commercial, and residential sites. The permit application was deemed technically complete and accepted for public review on September 29, 1995. A public review/comment period was allowed from October 18, 1995, to November 19, 1995, with a public hearing taking place on November 9, 1995; the time for public comments was extended through December 9, 1995. Following a second public hearing at the public's request on March 12, 1996, public comments were accepted through April 11, 1996.
After considering public comments, the administrator of the Solid Waste Division issued a "Briefing Sheet" directed to DEQ's assistant secretary concerning the staffs review of Belle's permit application. The briefing sheet disclosed concern regarding the following issues: the need for the landfill, the site selection process, the emergency response capabilities, and the landfill's slope design. Regarding need, the administrator noted that the solid waste disposal needs of Assumption Parish and the surrounding communities were currently being met. He also noted that the granting of a height increase to a nearby landfill provided for several years of available airspace. The administrator concluded that, because there was no reference in its application as to which existing area landfills would be closing, Belle had failed to establish need. The manner in which the siting process was conducted and the final site was selected were also noted as points of conflict. Opponents objected to the fact that the Belle site was selected before the process was complete and complained that the search area was limited to three parishes within the then-designated, nine-parish service area. The *229 issue as to which, if any, fire department could serve as the first response unit in the event of an emergency was also unresolved. Personnel within the identified fire department district maintained that their department would be unable to respond to emergencies on the site due to a lack of equipment and training. A report prepared by Louis J. Capozzoli and Associates, Inc. (LJC&A) shortly after Belle submitted its permit application questioned the stability of the slopes during construction, operation, and post-closure. Solid Waste Division engineers discovered that some of the calculations presented in the permit application concerning the design of the landfill were skewed.
In early 1997, personnel from LJC&A and the environmental consultant firm hired by Belle, G&E Engineering Environmental Consultants (G&E), re-evaluated slope stability and resolved the issues raised in LJC&A's report. Based on opponents' complaints that a 1994 alternative site study was too limited,[1] Latter & Blum, Inc. Realtors (L&B) updated the alternative site study in March 1997 by searching a fourteen-parish area for available real estate suitable for development as a solid waste landfill.[2] L&B located property that met the minimum physical criteria and other specified constraints. Of the sites investigated by L&B, only twenty properties in the fourteen-parish service area fit the stated criteria and were available for sale in March 1997. The identified properties were located in the following eight parishes: St. James, Iberville, West Baton Rouge, Ascension, Assumption, St. John the Baptist, Lafourche, and Terrebonne.[3] The site evaluation process performed by G&E in preparing the updated study, like the original study, consisted of three screening levels. In the first two levels, available sites were evaluated against criteria[4] established to eliminate sites with obviously undesirable characteristics. Five of the sites[5] were eliminated from consideration in the second level of screening. In the third level, the remaining sites were ranked according to the following attributes, which were prioritized, considered, and factored based on relative importance: confining geological layers, depth to potable aquifer, nonresidential receptors within three miles, residences within one mile, access and highway safety, acreage, flood zone, jurisdictional wetlands, location, coastal management zone, and existing land usage. G&E concluded that Belle's property ranked best among all the sites *230 identified with respect to providing protection to the environment.
In addressing the need for the Belle landfill in its April 29, 1997 letter to DEQ's assistant secretary, G&E revealed that eight solid waste disposal facilities were then currently operating within the service area or in the reasonably immediate vicinity. These were:
Colonial (BFI) Landfill (Ascension Parish) service area included five (Ascension, Assumption, Iberville, St. James, and St. John the Baptist Parishes) of the fourteen parishes in Belle's proposed service area and had an estimated closure date of August 2014;
Kelvin Landfill (Jefferson Parish)authorized to accept only waste generated in Jefferson Parish and had an estimated closure date of August 2006;
North East Baton Rouge Parish Landfill (NEBRPL)service area included three (Ascension, Iberville East, and West Baton Rouge Parishes) of the fourteen parishes in Belle's proposed service area and had an estimated closure date of November 2013;
Harold "Babe" Landry Reduction and Resource Landfill (St. Mary Parish) had an estimated closure date of December 1998;
Terrebonne Parish (Ashland) Landfill had an estimated closure date of December 1999;
Reliable (USA Waste) Landfill (Pointe Coupee Parish)had an unrestricted service area and an estimated closure date of July 2008;
Woodside Landfill (Livingston Parish) had an estimated closure date of November 2001; and
Greater New Orleans Landfill (GNOL)(Jefferson Parish)was scheduled for closure in June 1999.
A study of estimated solid waste generation rates for the fourteen parishes within the proposed service area and the estimated remaining capacity of these eight landfills for 1996, 2001, and 2006 revealed a significant decrease in disposal options by 2001, to be followed by a capacity shortage beginning in 2006. Based on available data, it was estimated that:
by December 2001, only four (BFI, Kelvin, NEBRPL, and Reliable) of the eight operating landfills would still be operating,
by December 2006, only three (BFI, NEBRPL, and Reliable) would still be operating, and
by December 2011, only two (BFI and NEBRPL) would still be operating, with an estimated remaining capacity sufficient to receive the estimated amount of waste generated by the proposed fourteen-parish service area for approximately one year.
As an additional consideration, G&E noted that recent experience suggested that it generally would take between five and ten years to prepare a permit application, complete the permitting process, and implement construction before a proposed facility would begin accepting waste. G&E suggested that this study evidenced the clear and demonstrable need for the proposed landfill. The record evidence includes a letter dated July 21, 1994, in which the chairman of the Louisiana Resource Recovery and Development Authority revealed that the proposed Belle facility did not conflict with any of its solid waste management plans.
In its April 29, 1997 letter, G&E conceded there was a general shortage of water available for firefighting in many areas of Assumption Parish. It assured DEQ that an overabundance of water would be provided at the facility for firefighting purposes to allow fire insurance *231 premiums to remain unaffected. Admittedly, no emergency response agreement had been executed with local fire departments, and Belle vowed to provide documentation that all appropriate emergency response agreements were executed prior to receiving waste. It submitted that Solid Waste Division regulations required only that an applicant identify proximity to emergency response services and provide a plan outlining facility operations and emergency procedures to be followed in case of accident, fire, explosion, or other emergencies. La. Admin. Code 33:VII.521.H.1.f. It asserted that fully executed emergency response agreements were not required during the application process and contended that these would be a premature expenditure of resources.
On August 15, 1997, DEQ granted Belle's permit application, setting forth the findings that it felt supported the issuance of the permit in a 25-page written decision. Following the background section of its decision, DEQ indicated the facts as presented by all interested parties via public comments, notice of deficiencies, and responses. Belle's responses to the requirements of Louisiana Administrative Code 33:VII.523.A-E, also known as "IT" responses,[6] were contained in DEQ's decision, along with a reference to DEQ's responses to all reasonable comments, which was attached as an exhibit to the decision.
DEQ made the following basic findings of fact relative to "IT" questions. After examining the real and potential adverse environmental effects on underground water, surface water, and air, as well as the measures to be taken by Belle to insure maximum protection to the environment, DEQ found that the potential and real adverse environmental effects of the facility had been avoided to the maximum extent possible. Considering the number of jobs created and the inevitable increase in disposal costs within the proposed service area caused by the anticipated closure of the Babe, Ashland, and GNOL landfills, DEQ determined that the social and economic benefits of the proposed facility outweighed the environmental-impact costs.[7] Recognizing the existence of several alternative methods of providing solid waste disposal, DEQ noted that landfills are the most basic forms of solid waste disposal and are necessary in any combination of disposal systems. Thus, it found that there were no alternative projects that would offer more protection to the environment than the proposed facility without unduly curtailing non-environmental benefits. After examining the results of the three-tier process used in determining the availability and suitability of alternative sites, DEQ found that the Belle site was the only site that did not exhibit any highly negative attributes. Considering the measures proposed by Belle to protect the environment, DEQ found no other mitigating measures and no alternative facilities or sites that would offer more protection to the environment without unduly curtailing non-environmental benefits. Based on these findings, on August 15, 1997, DEQ issued a standard Type I and Type II permit to Belle, subject to eleven limitations and conditions.[8]
*232 While Belle's permit application was pending before DEQ, the legislature enacted Louisiana Revised Statute 30:2157, pertaining to emergency response standards, which law became effective on June 20, 1997. 1997 La. Acts, No. 345, § 1. Section 2157 provides:
A. Prior to the issuance of the permit, an applicant for a solid waste disposal facility shall review and consider the ability of the local emergency response agencies and medical care facilities to respond to a hazardous material incident at the facility subject to the permit.
B. The applicant shall obtain certification from the local fire department as to whether or not that department has the ability to meet the response requirements of Section 472 of the Life Safety Code of the National Fire Protection Association. The applicant shall obtain certification from the local emergency medical services agency as to whether or not that agency has the ability to meet the response requirements of Section 473 of the Life Safety Code of the National Fire Protection Association. The applicant shall obtain certification from the local hospital as to whether they are able to accept and treat patients who are contaminated with hazardous materials.
C. In the event any such agency or hospital cannot certify that it is able to meet the requirements referenced in Subsection B of this Section, the applicant shall identify in the permit application the closest fire department, emergency medical service and hospital that can provide the services listed in Subsection B above. The department shall review and consider these agencies and hospitals to be the emergency response agencies and medical care facilities to respond to a hazardous material incident at the facility as a condition of the permit.
D. The requirements of this Section shall not apply if the applicant has the ability to meet the response requirements of Section 472 of the Life Safety Code of the National Fire Protection Association.
Although the effective date of this statute predated DEQ's permit decision in this case, DEQ made no reference to its specific requirements in its decision, noting merely that Belle had promised to secure appropriate emergency response certifications before becoming operational.
In attachments to its application, Belle identified the Paincourtville Fire Department and Prevost Hospital as the initial responders in the event of fire or medical emergency. DEQ responded to public comments concerning the Paincourtville Fire Department and Prevost Hospital's ability to respond to an emergency at the facility by stating that Belle had complied with solid waste regulations, which required only that an applicant identify the proximity to emergency response services and provide a plan outlining facility operations and emergency procedures to be followed in case of accidents, fires, explosions, or other emergencies. Nonetheless, DEQ recognized that Belle had stated that "fully executed emergency response agreements [would] be executed after issuance of the permit and prior to receipt of waste."
In a letter to DEQ's assistant secretary dated September 4, 1997, G&E, after questioning the applicability of Section 2157 to Belle's application, addressed the requirements of this statute as follows:
Belle believes that the administrative record for its standard permit clearly reflects compliance with R.S. 30:2157(A); local emergency response agency capabilities were carefully considered by Belle during the application process. *233 With respect to the requirement (§ 2157[B]) to obtain certification from the local fire department as to whether that department has the ability to meet the response requirements of Section 472 of the Life Safety Code of the National Fire Protection Association (NFPA), Chief Tracy LeBlanc of the Paincourtville Volunteer Fire Department stated the following in an undated letter regarding his department's capabilities:
The funds available to our department make this service economically impossible. Because of the lack of funding, we can neither provide the training or equipment to be considered the primary responding emergency medical or fire department.
Accordingly, Belle will either execute an agreement with an alternative responder (§ 2157[C]), or develop sufficient internal resources to comply with Section 472 of the Life Safety Code of the NFPA (§ 2157[D]). Belle is currently investigating its options in this regard.
As stated in previous correspondence concerning this issue, Belle is committed to constructing and operating a safe facility, and hereby reiterates its pledge to provide documentation that all appropriate emergency response agreements are executed prior to receiving waste....
Following DEQ's decision to issue a permit to Belle, on September 14, 1997, Assumption Parish Peoples Environmental Action League (APPEAL) filed a motion for appeal pursuant to Louisiana Revised Statute 30:2050.21.[9] Subsequently, APPEAL filed a petition for review with the district court naming DEQ as a defendant. In its petition and subsequent brief filed with the district court, APPEAL raised various assignments of error, which included:[10]
1. DEQ's failure to carry out its constitutional duty to protect the environment in various specified ways;
2. Belle's failure to fulfill the requirements of Louisiana Revised Statute 30:2157;
3. DEQ's failure to articulate a determination as required by Louisiana Revised Statute 30:2179 as to whether the proposed facility would cause the state to exceed 115 percent of the necessary total permitted capacity of this state; and
4. The adequacy of Belle's alternative site study.
In response to allegations in APPEAL's petition for review and G&E's September 4, 1997 letter concerning Belle's preparations to meet the emergency response requirements of Section 2157, DEQ modified the permit on September 30, 1997, to include the following two additional conditions:
12A. Certifications required under LA R.S. 30:2157 from the local fire department, emergency medical services and hospital shall be obtained or the closest fire department, emergency medical service, and hospital that can provide the required services shall be identified prior to commencement of operation of the facility; or

*234 B. To comply with Section 472 of the Life Safety Code of the NFPA (§ 2157[D]).
In APPEAL's district court action for review of the DEQ permit decision, Belle filed a petition of intervention. Belle was allowed to intervene and filed an "Ex Parte Motion to Present Additional Information" pursuant to Louisiana Revised Statute 30:2050.21(E), to meet the requirements of Louisiana Revised Statute 30:2179(B) concerning assessment of Louisiana's waste disposal capacity. In its motion, Belle submitted that DEQ had investigated the need for the proposed facility and advised Belle that the requirements of Section 2179(B) were specifically complied with before a decision was made on its application. Admittedly, DEQ's August 15, 1997 basis for decision did not address the statute's 115 percent limitation. Thus, by its motion, Belle sought to have DEQ include within its administrative record all of the projections and calculations required by Section 2179.
Subsequently, DEQ filed a motion to supplement the administrative record with the amended permit dated September 30, 1997. DEQ submitted that any defect in the August 15, 1997 permit with respect to Section 2157 emergency response capabilities had been rendered moot by the amendment of the permit on September 30, 1997, which allegedly provided for the necessary certification.
DEQ's motion to supplement the record was granted after a hearing on April 27, 1998, and Belle's motion to supplement was granted following a hearing on August 24, 1998.[11] Arguments as to the merits of APPEAL's petition for review were also heard at the latter hearing. After considering the administrative record, briefs, and arguments, the district court held that DEQ erred in granting a permit to Belle without prior compliance with Louisiana Revised Statute 30:2157.[12] Thus, DEQ's decision to issue a permit was reversed, and the matter was remanded for further proceedings.
Pursuant to Louisiana Revised Statute 30:2050.31, APPEAL appealed to this court, contending the district court erred in:
1. allowing Belle to supplement the administrative record with DEQ's "Supplement To the Basis for Decision;"
2. rejecting its claim that DEQ violated its constitutional duty as protector of the environment;
3. rejecting its claim that DEQ had failed to make the capacity determination required by Section 2179 prior to issuance of the permit; and
4. rejecting its claim that Belle's alternative site study was insufficient.
Belle filed an answer to the appeal, challenging the district court's finding that it had failed to comply with the requirements of Section 2157. On appeal, DEQ filed a motion to complete the record with Belle's "Reply Memorandum on the Merits of APPEAL's Challenge" and attachments, namely, DEQ's "Supplement To the Basis for Decision," pursuant to the district court's granting of Belle's motion to present additional evidence on August 24, 1998. An order allowing the inclusion of this information in the record was signed by this court.

*235 Review of Agency Decision

Judicial review of a final permit action is governed by Louisiana Revised Statute 30:2050.21, which specifically provides that the provisions of Louisiana Revised Statute 49:964(C), (F), and (G) shall apply to such an appeal. Louisiana Revised Statute 49:964(G) provides that the court may affirm the decision of the agency or remand the case for further proceedings; or, the court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.

District Court's Supplementation of the Administrative Record
Following the filing of APPEAL's petition for judicial review with the district court, a "Supplement To the Basis for Decision" was issued by DEQ to fully address the capacity determination and requirements of Louisiana Revised Statute 30:2179. APPEAL complains that the district court erred in allowing Belle to supplement the administrative record with DEQ's supplemental findings, citing Louisiana Revised Statutes 30:2050.21(D) and (E), 30:2014.3, and 49:964(E). APPEAL submits that the district court's review is limited to the administrative record established prior to the issuance of DEQ's final decision on August 15, 1997. Based on the cited statutes, it argues that remand to the DEQ was needed for supplementation of the administrative record with DEQ's supplement to its basis for decision.
Louisiana Revised Statute 30:2014.3 governing the review of DEQ decisions provides:
A. This Section shall apply to the department and all permit applicants and shall apply only with respect to the public trustee issues, as provided in Article IX, Section 1 of the Constitution of Louisiana and by the Supreme Court of Louisiana in the case of Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La. 1984). Subsequent case law and laws interpreting said decisions and the rules and regulations adopted by the department in accordance with those decisions may be used to implement the public trustee issues, to be addressed by the secretary when making decisions with respect to permits, licenses, registrations, variances, or compliance schedules authorized by this Subtitle.
B. The applicant and any person who may become a party to an administrative or judicial proceeding to review the secretary's decision on an application must raise all reasonably ascertainable issues and submit all reasonably available *236 evidence supporting his position on the permit application prior to the issuance of the final decision by the department so that the evidence may be made a part of the administrative record for the application.
C. No evidence shall be admissible by any party to an administrative or judicial proceeding to review the secretary's decision on the application that was not submitted to the department prior to issuance of a final decision or made a part of the administrative record for the application, unless good cause is shown for the failure to submit it. No issues shall be raised by any party that were not submitted to the department prior to issuance of a final decision or made a part of the administrative record for the application unless good cause is shown for the failure to submit them. Good cause includes the case where the party seeking to raise new issues or introduce new evidence shows that it could not reasonably have ascertained the issues or made the evidence available within the time established for public comment by the department, or that it could not have reasonably anticipated the relevance or materiality of the evidence or issues sought to be introduced.
Louisiana Revised Statute 30:2050.21 provides, in relevant part:
D. In matters not submitted to the division of administrative law, Department of Civil Service, the department shall transmit to the reviewing court the original or a certified copy of the entire record of the decision or action under review within sixty days after service of the petition on the department, or within further time allowed by the court. By stipulation of all parties to the review proceedings, the record may be shortened. A party unreasonably refusing to stipulate to limit the record may be taxed by the court for the additional costs. The court may require or permit subsequent corrections or additions to the record.
E. If, before the date set for hearing, application is made to the court for leave to present additional information, and it is shown to the satisfaction of the court that the additional information is material and that there was good cause for failure to present it in the proceedings before the department, the court may order that the additional information be taken before the department upon conditions determined by the court. The department may modify its findings and decision by reason of the additional information and shall file that information and any modifications, new findings, or decisions with the reviewing court.
Louisiana Revised Statute 49:964(E) provides:[13]
If, before the date set for hearing, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court.
*237 These statutes set forth the procedure for obtaining modification of the administrative record once an aggrieved party has sought review of the administrative decision. Clearly, where a party seeks to have additional evidence become part of the record being reviewed, remand is necessary to allow the administrative agency an opportunity to consider such evidence, if the district court is satisfied that the additional evidence is material and that there was good cause for failure to present it in the proceedings before the agency. With this in mind, we consider whether the information sought to be included in the appellate record by Belle fell within the purview of these procedural statutes requiring remand to DEQ.
In its supplement to its basis for decision, DEQ set forth the following facts in support of its determination, which are summarized as follows:
The service area was limited to fourteen Louisiana parishes, so it would dispose of waste generated in Louisiana only;
The new facility, with "state-of-the-art" waste management capabilities, would provide additional environmental protection over existing landfills;
The facility was needed to provide regional disposal options;
The secretary of DEQ used his personal knowledge of the following circumstances within the service area:
a) closure of GNOL with Riverbirch landfill as an anticipated replacement;
b) Kelvin landfill served only Jefferson Parish;
c) anticipated closures of Babe and Ashland landfills;
d) the continued viability of Reliable landfill was questionable; and
e) NEBRPL did not accept industrial waste and served primarily East Baton Rouge Parish;
The facility was needed for a regionally available landfill to cut down on transportation and environmental risks associated with long transport of solid waste;
The service area includes some of the fastest growing areas of the state;
The length of time required to plan, prepare, obtain a permit, construct a facility, and begin receiving waste requires the permit at this time; and
To the extent that Section 2179 may be applicable to non-hazardous solid waste, the secretary of DEQ had allowed additional capacity on a case-by-case basis, as specified by Section 2179(B)(2), based on an analysis of regional needs for the handling of strictly Louisiana wastes. The secretary also considered the state-wide capacity determination mentioned in Section 2179(B)(4) to have been reflected in the deliberations that formed the basis for the issuance of the permit.
A review of the record reveals that the factual information in this "Supplement To the Basis for Decision" was, for the most part, discernable from G&E's April 29, 1997 communication to DEQ's assistant secretary. Because such evidence was already available to DEQ when it made its decision, we conclude that, although styled as a motion for leave to present additional information, Belle's motion was not truly of that nature. Since Belle did not seek to present additional evidence for consideration by DEQ, there was no need for the district court to have remanded this matter to DEQ for the taking of additional evidence as required by the above statutes. Rather, what Belle moved to have included in the administrative record were the additional reasons given by DEQ in support of its decision to grant Belle a permit.
In appellate review of a judgment of a lower court, no additional evidence may be admitted, nor can the judgment be *238 modified, after the appellate court has jurisdiction over the case. See LSA-C.C.P. art. 2088. However, the judicial review of an administrative decision differs, in that the record can be supplemented and the agency's findings and decision can be changed, even after the matter has been submitted to the court. Under both Louisiana Revised Statute 49:964(E) and Louisiana Revised Statute 30:2050.21(E), DEQ may modify its findings and decision by reason of additional evidence allowed after the matter has been submitted to the court for review. In this case, as we have noted, there was no additional evidence presented. Rather, Belle and DEQ sought and obtained court approval to supplement the record to show that factual information already available to DEQ before the permit was issued had been considered and acted upon in making its decision. Logically, if the reviewing court may allow new evidence to be taken before DEQ and admitted after the matter has been submitted to the court, the reviewing court should also be able to allow the admission of a supplement to the basis for decision, provided such supplement is based on factual information already available to and considered by DEQ. Accordingly, we conclude the district court did not err in allowing Belle to supplement the administrative record with DEQ's "Supplement To the Basis for Decision."

Adequacy of DEQ's Reasons for Its Decision
APPEAL urges that the district court erred in rejecting its claim that DEQ violated its constitutional duty as protector of the environment by failing to detail its reasoning as required by law and jurisprudence. In making a decision, DEQ is required to make basic findings supported by the evidence and ultimate findings which flow rationally from the basic findings; it must also articulate a rational connection between the facts found and the order issued. In re American Waste & Pollution Control Co., 93-3163 (La.9/15/94), 642 So.2d 1258, 1266; Save Ourselves, Inc. v. Louisiana Envtl. Control Comm'n, 452 So.2d 1152, 1159. A decision in conformity with these mandates should contain: (1) a general recitation of the facts as presented by all sides; (2) a basic finding of facts as supported by the record; (3) a response to all reasonable public comments; (4) a conclusion or conclusions on all issues raised which rationally support the order issued; and (5) any and all other matters which rationally support the DEQ's decision. In re Rubicon, Inc., 95-0108 (La.App. 1st Cir.2/14/96), 670 So.2d 475, 483. Additionally, the written finding of facts and reasons for decision must satisfy the issues of whether: (1) the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; (2) a cost-benefit analysis of the environmental impact costs balanced against the social and economic benefits of the project demonstrate that the latter outweighs the former; and (3) there are no alternative projects or alternative sites or mitigating measures which would offer more protection to the environment than the proposed project without unduly curtailing non-environmental benefits to the extent applicable. In re Rubicon, 670 So.2d at 483.
Belle presented evidence that the adverse environmental effects of the facility had been avoided or minimized to the maximum extent possible. G&E made a cost-benefit analysis of the environmental and non-environmental factors to demonstrate that issuance of the permit would be compatible with the constitutional and statutory standard of environmental protection. DEQ was presented with evidence *239 to consider on alternative projects, alternative sites, and mitigating measures. Environmental costs were weighed against social and economic benefits of the project. Additionally, the weaknesses in Belle's application were pointed out by DEQ, APPEAL, and other concerned citizens and were rebutted or cleared up by Belle.
Utilizing such evidence, DEQ's "Basis for Decision" and "Supplement To the Basis for Decision" sufficiently comport with the requirements of the previously cited jurisprudence. Accordingly, we conclude that DEQ's decision is supported by its factual findings and its articulation of a rational connection between the facts found and the permit issued. In this respect, DEQ performed its duty as protector of the environment.

Determination of Need and Capacity
APPEAL contends that the briefing sheet from the administrator of the Solid Waste Division to DEQ's assistant secretary suggests that the landfill is not needed. However, following the issuance of the briefing sheet, Belle forwarded the April 29, 1997 letter from G&E to DEQ in response to the public's concern relating to need.
In determining whether the social and economic benefits of the proposed Belle facility outweighed the environmental costs, DEQ observed in its original written decision that the anticipated closure of three then-existing landfills (Babe, Ashland, and GNOL) could potentially impact the cost of solid waste disposal in the proposed service area. This observation reflects DEQ's apparent determination that there was a need for this facility. We conclude that such need was clearly implied by the evidence in the administrative record, as articulated in DEQ's supplement to the basis for its decision and as noted previously in this opinion.
APPEAL also urges that DEQ failed to make the capacity determination required by Louisiana Revised Statute 30:2179. The applicability of this statute to the facts of this case is questioned by Belle and DEQ, based on its placement within Title 30 of the Louisiana Revised Statutes.
The "Louisiana Solid Waste Management and Resource Recovery Law" is found in Chapter 8 of Subtitle II (Environmental Quality) of Title 30 of the Louisiana Revised Statutes. The legislature declared that the safety and welfare of the people of Louisiana require efficient and reasonable regulation of solid waste disposal practices, as well as a coordinated statewide resource recovery and management program. LSA-R.S. 30:2152. Chapter 8's definition of "solid waste" specifically excludes hazardous waste that is subject to permits under Louisiana Revised Statutes 30:2171 et seq., contained in Chapter 9 (Louisiana Hazardous Waste Control Law) of Subtitle II of Title 30. LSA-R.S. 30:2153(1)(a). DEQ's powers, duties, restrictions, prohibitions, and penalties with respect to solid waste management are outlined in Louisiana Revised Statute 30:2154. Louisiana Revised Statute 30:2158 governs the establishment of sanitary landfills in accordance with a plan for the orderly establishment of regional sanitary landfills. The following factors must be considered in deriving such a plan:
(a) Regional need for solid waste disposal.
(b) Available sites which will minimize hazards to the environment and which are consistent with the overall plan established pursuant to R.S. 30:2154(A)(1).
(c) Ability of those who would be served by such regional sites to finance and manage such facilities.

*240 (d) Minimizing the amount of waste which cannot be recycled.
(e) The concerns of local governments, private industry, and environmental groups.
(f) The potential for eliminating the proliferation of alternate sites by the establishment of such a regional system.
(g) Ensuring adequate competition within any region developed or implemented pursuant to such plan.
See LSA-R.S. 30:2158(A)(2). Belle's proposal met these requirements, and the Louisiana Resource Recovery and Development Authority confirmed that the proposed facility did not conflict with any of its solid waste management plans.
As previously noted, waste that is of a hazardous nature is subject to permits under Louisiana Revised Statutes 30:2171 et seq., the Louisiana Hazardous Waste Control Law (LHWCL). The placement of Section 2179 in the LHWCL seemingly indicates that the legislature did not intend for this statute to apply to the permitting of non-hazardous solid waste landfills. However, in various places in this statute, the legislature confusingly made reference to "solid and hazardous" waste.
Louisiana Revised Statute 30:2179 provides:
A. (1) Not later than January 1, 1988, the secretary of the Department of Environmental Quality in conjunction with the Hazardous Waste Advisory Board shall begin deliberations concerning the volume and types of solid and hazardous waste reduced, generated, transported, managed, recycled, disposed of or otherwise handled in Louisiana. The secretary and board, concurrent with their deliberations, shall deliberate concerning the capacity of Louisiana to safely and judiciously reduce, generate, transport, manage, recycle or dispose of these wastes.
(2) Not later than January 1, 1989, the secretary shall make a determination, with the counsel of the board, relative to the permitted capacity of Louisiana to safely reduce, transport, manage, recycle, dispose of or otherwise safely handle the solid and hazardous wastes generated within Louisiana.
B. (1) Upon determining the volume and types of solid and hazardous waste generated, reduced, transported, managed, recycled, disposed of or otherwise handled within Louisiana, and upon determining the capacity necessary for Louisiana to safely and judiciously reduce, transport, manage, recycle, or dispose of these wastes, the secretary shall determine the total permitted capacity necessary to manage or dispose of solid and hazardous waste in Louisiana.
(2) The secretary shall ensure that the expansion or modification of existing treatment, storage, or disposal facilities needed to promote improvements in handling, treatment, destruction, or disposal of wastes in Louisiana, and construction of new facilities which would result in the generation of additional waste in Louisiana, be provided for in determining the capacity limits to be permitted. The secretary shall allow additional capacity on a case by case basis when necessary to install facilities with additional capacity for future growth and expansion or for improving, destroying, or disposing of waste generated in the state. The secretary shall allow such additional capacity in a manner which shall encourage and shall not preclude the attainment or maintenance of state-of-the-art waste management capabilities.
(3) The secretary shall ensure that sufficient validly permitted waste handling, treatment, destruction, and disposal capacity exists to safely and efficiently *241 manage or dispose of waste substances in emergency situations or waste substances originating from instate waste sites.
(4) The secretary shall not issue any permits or licenses for the handling, treatment, destruction, and disposal of solid or hazardous waste which would increase the total permitted capacity of Louisiana to manage or dispose of such waste in an amount in excess of fifteen percent greater than the necessary total permitted capacity of this state as determined by the secretary pursuant to Paragraph (1) of this Subsection. The secretary shall reassess on a quarterly basis the capacity necessary to handle, treat, destroy, manage, and dispose of wastes generated in Louisiana and shall insure that there is sufficient capacity to maintain the capacity within Louisiana to so handle, treat, destroy, manage, and dispose of these wastes at the level and in that amount as required in this Paragraph. However, the secretary may vary the total permitted capacity above the fifteen percent limitation for any year by rule adopted in accordance with the Administrative Procedure Act, R.S. 49:950 et seq., provided the secretary finds, based on reliable evidence in the record of a public hearing on the proposed rule, that failure to increase the total permitted capacity above the limitation required by this Section will result within one year in insufficient capacity for the proper handling, treatment, storage, and disposal of solid or hazardous waste generated in the state.
(5) The fifteen percent limitation above the total permitted capacity shall be applied on an aggregate basis and shall not be applied individually to a certain facility.
C. The provisions of this Section shall not prohibit the issuance of a permit for the treatment, storage, or disposal of solid waste for a single or multiparish system, the application for which was submitted to the Department of Environmental Quality for approval on or before July 1, 1988, or hazardous waste, the application for which was submitted to the Department of Environmental Quality for approval on or before July 1, 1987.
These statutory provisions have recently been addressed by this court in connection with a DEQ permit for a commercial hazardous waste incinerator. In Coalition for Good Government v. Louisiana Department of Environmental Quality, 99-2843 (La.App. 1st Cir.10/18/00), 772 So.2d 715, writs denied, 01-0129, 01-0130 (La.4/12/01), 789 So.2d 589, 590, the citizens' groups asserted that DEQ had issued the permit in violation of Section 2179, in that DEQ had declined to perform the calculations required by Section 2179(B)(4). The citizens' groups urged that this statute required DEQ to determine how much hazardous waste capacity was needed in Louisiana and to prohibit the issuance of a permit that would create more than fifteen percent of excess capacity. In addressing the requirements of this statute in the context of a hazardous waste setting, this court noted:
Section 2179 B(2) mandates that DEQ allow additional permitted capacity on a case-by-case basis when necessary to provide additional capacity for treating or disposing of waste generated within the state. It provides that the "secretary shall allow such additional capacity in a manner which shall encourage and shall not preclude the attainment or maintenance of state-of-the-art waste management capabilities." The CBFD specifically explains that the "additional" capacity is being provided for waste generated in Louisiana. Therefore, this analysis falls under Subsection B(2), *242 which applies to waste generated within the state; the capacity determination under Section B(1) and the 115% limitation in Subsection B(4) apply to the total permitted capacity and are not applicable.
Coalition for Good Government, 772 So.2d at 733.
This case, although not involving the disposal of hazardous waste, is similar to the above case, in that it involves the disposal of waste generated only in Louisiana. Therefore, even if this statute were construed as being applicable to non-hazardous solid waste, Sections 2179(B)(1) and (4) would not be applicable to the Belle facility, and DEQ would not be required to make the capacity determination required by those sections of the statute. In addition to establishing need, the record evidence shows the facility proposed by Belle would encourage the attainment or maintenance of state-of-the-art waste management capabilities. Accordingly, we find no abuse of the agency's discretion in permitting the Belle facility on the basis of need and in allowing additional permitted capacity for waste generated within the state.[14]

Alternative Site Study
The sufficiency of Belle's alternative site study is also challenged by APPEAL. In making its determination regarding alternative sites, DEQ relied on a revised siting study performed in October 1994 by Belle's environmental consultants, G&E. Town and Country Properties, Inc. (Town and Country) was selected by G&E to assist in the search for appropriatelysized sites that were available in three parishesAssumption, Ascension, and St. James. Following its study of the three-parish area, Town and Country provided G&E with a "site data sheet" on thirteen potential sites. These sites were subjected to a three-tier analysis as required by applicable regulations, at the conclusion of which the Belle site was the only location that did not exhibit any highly negative attributes.
APPEAL questioned Belle's limitation of its search for available sites to three parishes because the then-proposed service area was comprised of nine parishes. In this respect, we note this court has found it inherently unreasonable to limit consideration of alternative sites to arbitrary geographical boundaries where the potential benefits and risks of the proposed facility will impact a multi-parish, if not a multi-state region. In re Browning-Ferris Indus. Petit Bois Landfill, 93-2050 (La.App. 1st Cir.6/23/95), 657 So.2d 633, 639, writs denied, 95-2127, 95-2155 (La.11/27/95), 663 So.2d 742. Based on public criticism of its limitation of the site selection process to three parishes and possibly in the wake of this court's decision in the above case, G&E updated its study in the early part of 1997 to locate available, suitable sites in each parish within the newly proposed fourteen-parish service area. Although not specifically referenced by DEQ in its decision, the updated study is part of the administrative record on which the DEQ decision was based. Having reviewed this study, we conclude it was sufficient to have enabled DEQ to fulfill its responsibility for ensuring that the environment would be protected to the maximum extent possible consistent with the health, safety, and welfare of the affected people.

*243 Louisiana Revised Statute 30:2157

Belle filed an answer to the appeal, challenging the district court's finding that, because Belle had failed to comply with the requirements of Louisiana Revised Statute 30:2157, DEQ had erred in issuing the permit. In its brief to this court, Belle questions the applicability of this statute, since it became effective on June 20, 1997, only two months before the permit was issued and after most of DEQ's work had been completed. APPEAL takes issue with the timeliness of Belle's challenge to the applicability of the statute, arguing that Belle did not previously raise this issue before DEQ or the district court.
No issues shall be raised by any party that were not submitted to DEQ prior to issuance of a final decision unless good cause is shown for the failure to submit them. See LSA-R.S. 30:2014.3(C). Good cause includes the case where the party seeking to raise new issues shows that it could not reasonably have ascertained the issues within the time established for public comment by DEQ or that it could not have reasonably anticipated the relevance or materiality of the issues sought to be raised. LSA-R.S. 30:2014.3(C). In the present case, the statute in question was enacted more than a year after the time established for public comment; therefore, it would have been impossible for Belle to have taken issue with its applicability at that time. Therefore, good cause exists in this instance for Belle's failure to timely raise this issue at the administrative level. Moreover, we note that approximately two months after the enactment of this statute, but after DEQ's original decision in this matter, G&E did address this issue in a letter to DEQ's assistant secretary.
The general rule of law is that substantive laws apply prospectively only, while procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary. LSA-C.C. art. 6. Article 6 requires that we engage in a two-fold inquiry: first, we must ascertain whether in the enactment of the law the legislature expressed its intent regarding retrospective or prospective application; if not, we must then classify the enactment as substantive, procedural, or interpretive. Keith v. United States Fld. & Guar. Co., 96-2075 (La.5/9/97), 694 So.2d 180, 183; Rousselle v. Plaquemines Parish Sch. Bd., 93-1916 (La.2/28/94), 633 So.2d 1235, 1244; Cole v. Celotex Corp., 599 So.2d 1058, 1063 (La. 1992); In re BASF Corporation's Exemption Permit from Hazardous Waste Land Disposal Restrictions, 99-0302 (La.App. 1st Cir.7/31/00), 765 So.2d 1171, 1176-1177.
Section 2 of 1997 La. Acts, No. 345, which enacted Louisiana Revised Statute 30:2157, established the effective date of the legislation as the date of signature by the governor, which was June 20, 1997. However, there is nothing in the legislation specifying retrospective or prospective application to pending actions in which a decision has not been issued; therefore, we must classify the enactment as substantive, procedural, or interpretive. See In re BASF, 765 So.2d at 1177.
It is well-settled that substantive laws either establish new rules, rights, and duties, or change existing ones, while interpretive laws merely establish the meaning the statute had from the time of its enactment. Keith, 694 So.2d at 183; St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 817 (La.1992). Procedural laws prescribe a method for enforcing a previously existing substantive right and relate to the form of the proceeding or the operation of the laws. Keith, 694 So.2d at 183; Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714, 723, cert. denied sub nom., Allstate Ins. Co. v. Louisiana *244 Ins. Guar. Ass'n, 511 U.S. 1142, 114 S.Ct. 2165, 128 L.Ed.2d 887 (1994).
In In re BASF, 765 So.2d 1171, at issue was a subsection in a statute, enacted after the applicant had filed its application for an exemption permit, which ostensibly reduced the applicant's burden of proof for obtaining the permit sought from DEQ. This court, relying on the decision in Keith, 694 So.2d 180, concluded that the legislation was procedural in nature and was applicable to that proceeding. In re BASF, 765 So.2d at 1178. This court observed that the substantive right of the applicant to apply for an exemption from the land disposal of hazardous waste existed prior to the enactment of the statute. Because the enactment merely lessened the burden on the party seeking to operate an injection well for the disposal of hazardous waste and altered the nature of the determination needed to be made by DEQ, this court concluded it was simply a delineation of a method for enforcing the applicant's substantive right.
In the instant case, Act 345 altered the burden on the party seeking to operate a solid waste disposal facility and required a more detailed determination by DEQ relative to emergency response standards. To the extent that this statute expanded the nature of the proof required from the applicant, this case differs from the situation presented to this court in the BASF case. Nevertheless, this case is similar to that case, in that the substantive right of the applicant, Belle, to apply for a permit for a Type I and Type II solid waste disposal facility existed prior to the enactment of Act 345. Additionally, before being enacted into law, the regulations required similar information in the permit application concerning the facility's
procedures, equipment, and contingency plans for protecting employees and the general public from accidents, fires, explosions, etc., and provisions for emergency care should an accident occur (including proximity to a hospital, fire and emergency services, and training programs)....
La. Admin. Code 33:VII.521.H.1.f. The provisions of Act 345 merely clarify that the facility's emergency response plans should identify responders with the actual capability of providing the services needed, so DEQ will have a realistic basis for evaluating those plans. For these reasons, we find Act 345 to be a procedural law and applicable to the instant proceeding.
Louisiana Revised Statute 30:2157 provides:
A. Prior to the issuance of the permit, an applicant for a solid waste disposal facility shall review and consider the ability of the local emergency response agencies and medical care facilities to respond to a hazardous material incident at the facility subject to the permit.
B. The applicant shall obtain certification from the local fire department as to whether or not that department has the ability to meet the response requirements of Section 472 of the Life Safety Code of the National Fire Protection Association. The applicant shall obtain certification from the local emergency medical services agency as to whether or not that agency has the ability to meet the response requirements of Section 473 of the Life Safety Code of the National Fire Protection Association. The applicant shall obtain certification from the local hospital as to whether they are able to accept and treat patients who are contaminated with hazardous materials.
C. In the event any such agency or hospital cannot certify that it is able to meet the requirements referenced in Subsection B of this Section, the applicant shall identify in the permit application *245 the closest fire department, emergency medical service and hospital that can provide the services listed in Subsection B above. The department shall review and consider these agencies and hospitals to be the emergency response agencies and medical care facilities to respond to a hazardous material incident at the facility as a condition of the permit.
D. The requirements of this Section shall not apply if the applicant has the ability to meet the response requirements of Section 472 of the Life Safety Code of the National Fire Protection Association.
Belle argues that what is required of the applicant prior to issuance of the permit is found only in subsection A, calling on this court to determine whether the requirements of subsections B through D must also be satisfied prior to the issuance of the permit.
An applicant is required by subsection B to obtain the specified certifications from the local fire department, local emergency medical services agency, and local hospital. In the event that certifications cannot be obtained from one or more of these, subsection C mandates that the applicant identify in the permit application the closest fire department, emergency medical service, and hospital that can provide such emergency services. It further mandates that DEQ consider these entities to be the emergency responders to a hazardous material incident at the facility as a condition of the permit.
By placing these constraints on the applicant and DEQ, the legislature seemingly anticipated that the requirements of subsections B and C would have to be satisfied during the applicant's review and consideration of the emergency responders as mandated by subsection A. To interpret this statute otherwise would render some portions of it meaningless. Furthermore, we note that all sections of the statute require "the applicant" to provide this information, implying by the use of this designation that all of these requirements apply to the permit application process, rather than to an already-permitted facility. Accordingly, in determining whether the permit should be issued, DEQ must decide whether the applicant for a permit for a solid waste disposal facility has satisfied the requirements of Section 2157. A permit should not be issued in the absence of evidence of compliance with subsections A, B, and C. The only way an applicant can avoid the requirements of those subsections is to provide evidence that the applicant itself has the ability to meet the necessary response requirements, in accordance with subsection D. Such a showing, in this court's opinion, must be made during the application process.
Therefore, DEQ, in requiring as a condition of the permit that Belle merely comply with the requirements of Section 2157 before the landfill became "operational," violated the provisions of this statute. Since the record reveals that these statutory requirements were not complied with prior to the issuance of the permit, we find no error in the district court's reversal of DEQ's decision to grant the permit prior to compliance with Section 2157 and its remand of this matter for further proceedings on the issue of compliance with the emergency response statute.

Decree
For the reasons assigned, we affirm the judgment of the district court; all costs of this appeal are to be borne by Belle Company, L.L.C.
AFFIRMED.
NOTES
[1] In August 1994, Belle, with the assistance of G&E and Town and Country Properties, Inc., evaluated thirteen available sites within Ascension, Assumption, and St. James Parishes. This study was revised in October 1994.
[2] The new proposed fourteen-parish service area included Ascension, Assumption, Iberville, Jefferson, Lafourche, Orleans, St. Charles, St. James, St. John the Baptist, St. Mary, Terrebonne, West Baton Rouge, Iberia, and St. Martin Parishes. G&E noted in an April 29, 1997 letter to DEQ's assistant secretary that several of these parishes were among the fastest-growing in Louisiana.
[3] G&E reported that Jefferson, Orleans, and St. Mary Parishes were considered unsuitable for siting a solid waste landfill, either due to the abundance of densely populated areas or the presence of vast areas of wetlands or flood zones. Small sections of Iberia and St. Martin Parishes within the proposed service area were also eliminated at the first screening level due to the presence of wetlands or flood zones. Additionally, no available site was identified within St. Charles Parish that was acceptable according to the first level criteria.
[4] Examples of such criteria included the proximity to populated areas, to wetlands, to flood zones, and to airports.
[5] The possible sites consisted of the twenty sites identified by L & B, as well as the site owned by Belle.
[6] Save Ourselves, Inc. v. Louisiana Envtl., Control Comm'n, 452 So.2d 1152 (La.1984), is referred to as the "IT" decision. See In re Rubicon, Inc., 95-0108 (La.App. 1st Cir.2/14/96), 670 So.2d 475, 482.
[7] In so finding, DEQ relied on an economic analysis report prepared for Belle by Dr. James A. Richardson, professor of economics at Louisiana State University.
[8] The permit stated that the service area would be limited to the fourteen parishes previously identified.
[9] An aggrieved person may appeal devolutively a final permit action, a final enforcement action, or a declaratory ruling only to the Nineteenth Judicial District Court. A petition for review must be filed in the district court within thirty days after notice of the action or ruling being appealed has been given. The district court shall grant the petition for review. LSA-R.S. 30:2050.21(A).
[10] Other concerns have been omitted because they are not relevant to the appeal before this court.
[11] These rulings were reflected in the minutes of the district court. The ruling on DEQ's motion indicated that judgment would be signed accordingly. However, the record is devoid of any such judgment. Nor could this court find a judgment incorporating the district court's ruling on Belle's motion.
[12] APPEAL's other complaints were found by the district court to be without merit.
[13] After the appeal of this matter to the district court, this statute was amended by 1999 La. Acts, No. 1332, § 1, effective July 12, 1999. The 1999 revisions were designated by the legislature to be remedial in nature and did not alter the cited subsection.
[14] In light of our conclusion that Section 2179(B)(1) and (4) does not apply to situations involving waste generated within the state, we pretermit the issue of whether Louisiana Revised Statute 30:2179 is applicable only to permits involving hazardous waste, or whether it actually was intended to apply also to non-hazardous solid waste.